UNITED STATES of America, Plaintiff,

v.

Daniel FATICO, Defendant.

No. 76–CR–81.

United States District Court,
E. D. New York.

July 27, 1978.

TABLE OF CONTENTS — Page

Introduction — 390

I. Facts — 391

  A. Prior Proceedings — 391
  B. Sentencing Hearing — 391
  C. Daniel Fatico — 394
  D. Judicial Notice—Organized Crime — 395

II. Law — 396

  A. Sentencing — 396

    1. Critical Stage of Criminal Process — 396
    2. Presentence Report — 396
    3. Due Process Limitations on Sentencing — 397
    4. Protections Not Afforded the Defendant — 398

      a. The Right of Confrontation — 398
      b. Unavailability of Prior Statements — 399

  B. Liberty Interest of Defendant at Sentencing — 400

    1. In General — 400
    2. "Special Offender" Status — 401

  C. Burden of Proof — 402

    1. The Continuum — 402

      a. Burdens in General — 402
      b. Preponderance of the Evidence — 403
      c. Clear and Convincing Evidence — 404
      d. Clear, Unequivocal and Convincing Evidence — 405
      e. Proof Beyond a Reasonable Doubt — 405

    2. Preponderance Standard of the "Dangerous Special Offenders" Act — 406
    3. Higher Sentence Based on Proof of a Fact Not Established in Criminal Trial — 408

III. Facts Applied to Law — 412

  Conclusion — 412

## MEMORANDUM

WEINSTEIN, District Judge.

In view of prior proceedings, *see United States v. Fatico,* 441 F.Supp. 1285, 1287 (E.D.N.Y.1977), *reversed,* 579 F.2d 707 (2d Cir. 1978), the key question of law now presented is what burden of proof must the government meet in establishing a critical fact not proved at a criminal trial that may substantially enhance the sentence to be imposed upon a defendant. There are no precedents directly on point.

The critical factual issue is whether the defendant was a "made" member of an organized crime family. Clear, unequivocal and convincing evidence adduced by the government at the sentencing hearing establishes this proposition of fact.

David G. Trager, U. S. Atty., E. D. N. Y., Brooklyn, N. Y. (Robert J. Lynn, Sp. Atty., U. S. Dept. of Justice, Organized Crime Task Force, Paul F. Corcoran, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for plaintiff.

Saxe, Bacon & Bolan, New York City (Roy M. Cohn, Michael Rosen, Ronald F. Poepplein, New York City, of counsel), for defendant.

## I. FACTS

### A. Prior Proceedings

Defendant was indicted with others for receiving goods stolen from interstate commerce during three hijackings of trucks from Kennedy Airport. 76–CR–80, 76–CR–81 and 76–CR–218 (E.D.N.Y.). At his initial trial on indictment 76–CR–218 the jury failed to agree. Defendant then entered a guilty plea to the conspiracy charge in indictment 76–CR–81 in satisfaction of all charges in the three pending cases. He now faces a maximum penalty of five years imprisonment and a $10,000 fine. 18 U.S.C. § 371.

Prior to sentencing, the defendant objected to suggestions in the presentence reports that he has strong ties to organized crime and is a "made" member of the "Gambino Family," reputedly a mafia-like group. The United States offered to support the allegation at a sentencing hearing. It proposed to rely on the testimony of an FBI agent based upon information furnished to him by a confidential informant whose identity would not be revealed.

Agreeing with the government that disclosure would imperil the life of the informer, this court nevertheless refused to hear the FBI agent's testimony, noting that "for the court, without disclosure, to rely upon such untested evidence in a situation such as the one before us would violate the Fifth Amendment right to Due Process and the Sixth Amendment right of Confrontation." *United States v. Fatico*, 441 F.Supp. 1285, 1289 (E.D.N.Y.1977). The Court of Appeals reversed, "holding that . . . neither the Confrontation nor the Due Process Clause is violated by use in sentencing of information supplied by an unidentified informant where there is good cause for not disclosing his identity, and the information he furnishes is subject to corroboration by other means." *United States v. Fatico*, 579 F.2d 707 at 708 (2d Cir. 1978). The additional evidence proffered by the Government to corroborate the informant consisted of the testimony of two unindicted co-conspirators, Salvatore Montello and Manuel Llauget, independent observations of police officers, and the defendant's criminal record. 579 F.2d at 709–710 & nn. 3, 4. In view of the Government's corroborative evidence, the Court of Appeals held that "the trial court erred in excluding the agent's testimony about. the informer's declaration once the Government represented that it would produce the specified corroboration." *Id.* at 713.

The Court of Appeals accepted, and neither party challenges, this court's judgment that "membership in and ties to professional criminal groups are material facts that should be considered in sentencing." 579 F.2d at 710 & n. 5. It expressed "no views on the sentence ultimately to be imposed," *id.* at 714 n. 17, and indicated that "the weight given to the informer's declarations and the assessment of credibility are matters for the sentencing court." *Id.* at 713 n. 14.

### B. Sentencing Hearing

Pursuant to the Court of Appeals' directive, an evidentiary sentencing hearing was held to determine whether, as reported in the pre-sentence report, the defendant was a "made" member of the Gambino family or otherwise involved in organized crime. The Government called ten witnesses. The defendant did not call any. In its original proffer, the Government had stated that one FBI agent would testify about information supplied to him by one reliable informant. At the hearing, the Government produced seven law enforcement agents— both federal and state—who testified that seventeen different informants had independently told them that the defendant and his brother, Carmine Fatico, a codefendant, were "made" members of the Gambino family.

Government witnesses painted a composite portrait of extensive organized crime activity in the New York City area. Briefly summarized, the following general conclusions of law enforcement agencies emerged during the course of the hearing. There are five active organized crime families operating in the greater metropolitan area: The Colombo family; the Lucchese family;

the Genovese family; the old Bonana family and the Gambino family. Transcript at pp. 32–33, 177–78. At the top of each family is the Boss. Directly underneath the Boss is the Underboss, or executive officer. Next in line is the Counselor, or "Consiglier," who helps "keep the peace." Transcript at pp. 29–30, 176, 183. The organization then branches out with tens of "Capos," or "lieutenants," at the next level. The Capos, in turn, direct a substantial network of "soldiers"—numbering in the hundreds, depending upon the size of the family. The soldiers, all of whom are officially initiated, full-fledged members of the crime family, are variously referred to as "buttons," "made-men," "nice fellows," or "good guys." Transcript at pp. 29–32, 89–92, 176. Beneath the "soldiers" are the "non-member associates," affiliated with the family, but not "made"—that is, initiated into the family. Transcript at pp. 31–32, 176–77. Each capo has a social club or headquarters which serves as a meeting place for family members and associates in a particular territory. Transcript at p. 181.

According to one witness, Aniello Dellacroce is now the boss of the Gambino family; Paul Castellano is the underboss and Joseph N. Gallo is the consiglier. The Gambino family now has at least twenty capos, including Carmine Fatico. Spread across the Eastern seaboard from Rhode Island to Florida and inland as far as Detroit there are allegedly some 1100 soldiers. Defendant is a "made" soldier. Transcript at pp. 177–85. The principal activities of the Gambino family are said to be loan sharking, hijacking, narcotics, gambling and extortion. Transcript at p. 32.

The first Government witness, Joseph Fanning, is a recently retired FBI agent with 27 years experience. Mr. Fanning spent the past sixteen or seventeen years on organized crime matters, most recently as a member of the Long Island Special Task Force on Organized Crime. For the past two years, he worked with someone who had informed since 1966–67. Fanning described the informant as a reliable, long active and highly placed member of the Gambino family. Transcript at pp. 9, 11,

20. On Easter Sunday 1978 the informant told him that both Daniel and Carmine Fatico had been members of the Gambino family for over twenty years. Transcript at pp. 12–13.

Martin Boland, an FBI agent for some fifteen years, had spent almost ten years in the New York Organized Crime Division. He had contact with another informant. First developed in 1971–72 and considered reliable by Boland (Transcript at pp. 26–27), the informant told this agent that Daniel Fatico was the brother of Carmine Fatico and worked under him as a "button." Transcript at p. 35. The two brothers reportedly specialized in hijacking and gambling. Transcript at p. 38.

Another FBI agent, Joseph F. Keating, testified that he had worked with a third informant for more than three years (Transcript at p. 61) and that the informant had proved reliable over time. Transcript at p. 63. Keating, an FBI agent for nine years and now with the New Rochelle Organized Crime Division, testified that his informant told him that he believed the Fatico brothers were members of the Gambino family. Transcript at pp. 65–66. He also testified that according to his information Danny Fatico had paid off police for gambling protection. Transcript at pp. 65, 72–73.

The next FBI agent, Charles Boling, had spent eight years with the Bureau and now works for its New York City Hijacking Squad. For the past five years he had cultivated a fourth informant, who, he said, consistently supplied reliable information. Transcript at pp. 77–81. Boling's informant reported that both Faticos were members of the Gambino family and that they operated a "crew" of associates. Transcript at pp. 79–80. According to this informant, Danny and Carmine Fatico engaged principally in gambling, loan sharking and hijacking. Transcript at p. 80.

Robert John, a detective investigator in the Suffolk County District Attorney's Office for eight years and a member of the Organized Crime Task Force in the Eastern District of New York, testified that on

March 25, 1971 he observed Carmine Fatico walking with Salvatore Montello for forty-five minutes in the vicinity of the Bergen Hunt and Fish Club in Ozone Park, New York. Transcript at p. 155. This confirmed Montello's testimony about a meeting with Carmine Fatico. Transcript at p. 106. It also supported testimony at trials before this court and testimony at the sentencing hearing suggesting that the Hunt and Fish Club was the Faticos' criminal base. John further testified that a fifth informant he had worked with since 1974 had told him that Carmine Fatico would mediate disputes between different factions in Suffolk County engaged in gambling, loan sharking and labor disputes. Transcript at pp. 160–61. This detective declared that in early 1974, he saw the informant, who at that time was not yet cooperating with the government, in the presence of Daniel and Carmine Fatico. Transcript at pp. 161–62.

The most far-ranging of all the testimony was that of Detective John P. Capobianco of the Brooklyn County District Attorney's Office. Capobianco, who coordinates organized crime investigations, has been on the police force for twenty-four years, nineteen of which were devoted to organized crime matters. His experience in the field dates back to his early days in Brooklyn where he grew up with various organized crime members including Vincent Napoli, recently sentenced by this court on separate heroin and gun convictions, and others like Sonny Francese, who was sentenced by the Chief Judge of this court to a long term for masterminding a series of bank robberies. Transcript at pp. 174–75. He testified that he personally worked with eight different informants, most of them since 1969–1970, and that they had proved reliable. Transcript at p. 187. Two, he noted, were no longer active—one was dead, the other has been missing since April. Transcript at p. 185. Only two of the informants knew each other. Transcript at p. 187. None of the informants were "made" members of the Gambino family. Transcript at pp. 203–04. The informants reported that Carmine Fatico was a "capo" and Daniel was a "button." Transcript at p. 188.

Capobianco also stated that in 1971–72 he had personally observed Carmine Fatico in front of the Ravenite Social Club on Mulberry Street talking with Joseph N. Gallo and Aniello Dellacroce. The Ravenite Social Club was reputedly the criminal headquarters of Dellacroce. The three men were doing a "walk and talk" to make sure they were not being bugged. Transcript at pp. 189–92. This confirmed testimony of Llauget and Montello respecting "sit downs," or arbitration conferences, conducted by the then underboss of the Gambino family, Dellacroce. See Government Exhibit 3, Hearings before the Permanent Subcommittee on Investigation, Committee on Government Operations, U.S. Senate, Eighty-Eighth Cong., First Sess., Chart C, p. 294. The detective also testified that on another occasion he had observed various other purported members of organized crime entering and leaving the Bergen Hunt and Fish Club when Daniel and Carmine Fatico were on the premises. Transcript at p. 192.

Kenneth McCabe, Detective Capobianco's partner, also testified. McCabe, with ten years in the New York City Police Department, has spent nine years working in the Kings County Organized Crime Unit. He stated that much of his information indicating Daniel and Carmine Fatico's criminal activities came from four additional confidential informants.

Detective McCabe authenticated a police arrest blotter for November 24, 1966 that showed that Carmine Fatico had been arrested for consorting with known criminals at the Ravenite Social Club. Transcript at p. 218. Also arrested were Dellacroce, Joseph N. Gallo and nine other reputed major criminals. The charges were dismissed. Transcript at pp. 218–23. McCabe stated that in 1970–71 he had observed Carmine Fatico with Dellacroce and Gallo at the Ravenite Social Club (Transcript at pp. 223–24) and that he has also observed Daniel Fatico with various other members of organized crime. Transcript at p. 224.

In addition, McCabe testified that he had personally maintained surveillance for three days in October or November 1976 at Carlo Gambino's wake. McCabe had information that the wake would be restricted to family, business associates and criminal associates. Transcript at p. 234. McCabe stood at the door of the funeral home, where he observed that both Carmine and Daniel Fatico were admitted to pay their respects. Transcript at pp. 225–27, 235. The Fatico brothers were also observed by McCabe at the wakes of Carlo Gambino's brother and Leonard Vario, the son of Paul Vario, Jr., the alleged consiglier in the Lucchese family. Transcript at p. 227.

It was established on cross-examination that McCabe had no recollection of Mr. Michael Rosen, Carmine Fatico's attorney, although Mr. Rosen stated that he, too, had attended the Gambino wake. It was suggested that this fact cast doubt on McCabe's credibility, a conclusion this court rejected since, given the crowded conditions at the wake, it was hard to observe or identify all the mourners. Transcript at pp. 237–39.

Finally, both Salvatore Montello and Manuel Llauget, unindicted co-conspirators in the fur hijackings, testified. They had also been called as key witnesses in prior cases tried by the court where, after devastating attacks on their credibility, the juries had failed to convict. Both men have extensive criminal records running back over more than twenty years. *See* Government Exhibits 1 and 2, FBI record sheets. Llauget's record includes a conviction for murdering his wife. For the past three years both men and their families have been supported by the public under the Government's witness protection program.

Montello admitted that he had been an associate, but not a "made" member of the Colombo crime family and had worked for the Faticos whom he knew, through other organized crime sources, to be "made" members of the Gambino family. Transcript at pp. 92, 94–95, 114–15. He testified that in 1971 he had known the Faticos for several years, having first met them at social clubs which the Faticos ran in the early 1960s. According to Montello and Llauget, these clubs, such as the Bergen Hunt and Fish Club in Queens, were centers for gambling and other organized crime activities. Transcript at pp. 96, 138. In 1969 Carmine Fatico offered Montello a "piece" of his gambling operation in Suffolk County, and put Montello on notice that he, Fatico, was in the market for truckloads of stolen goods. Transcript at pp. 103–06. In 1971, when Montello and Llauget began working with the Faticos, it was clear to Montello from the demeanor of the Faticos and from the respect they received in the criminal community that they were "made" members of an organized crime family. Transcript at pp. 95, 110.

In addition, Montello (Transcript at pp. 107–08) and Llauget both testified that in March of 1971, when a dispute arose concerning the quantity and quality of some 7,000 hijacked furs delivered to the Faticos, a "sit-down" was arranged with Underboss Aniello Dellacroce. Llauget was taken by Daniel Fatico to a "social club" on Mulberry Street in Manhattan where Fatico and Llauget met with Dellacroce and the disgruntled "buyer" of the furs. Dellacroce arbitrated the dispute and, after questioning Llauget about furs, decided that Llauget was telling the truth and would be paid the agreed price for the stolen furs. Transcript at pp. 107–08, 140–46; *cf.* Testimony of Detective Capobianco, *supra.*

## C. Daniel Fatico

The presentence report reveals that the defendant Daniel Fatico was born in Brooklyn, New York in 1920, the youngest of seventeen children of Carmine and Libera Fatico, his Italian born immigrant parents. Only three of his siblings survived beyond childbirth or infancy. Two of the brothers followed their father into the Sanitation Department and two went into crime.

The defendant was raised in the then predominantly Italian working class neighborhood of East New York in Brooklyn. After his father was killed in a fall from a roof in 1923, his mother kept the family

intact, supplementing her $50 monthly widow's pension by employment as a school matron and by family contributions. In 1937, having completed the tenth grade, the defendant left school. He had an average IQ.

At age twenty-one, defendant married his present wife. They have three grown children, all productively and legally employed. The couple live in a two-family home, located in the middle class residential neighborhood of Sheepshead Bay, Brooklyn and jointly owned and occupied by the families of the defendant and his son-in-law.

The defendant's extensive criminal record spanning the past 36 years began in 1941 when, at twenty, he was placed on probation for three years after being convicted of unlawful entry. Thereafter followed, at regular intervals, more than twenty convictions for assaults, bookmaking and operating an illicit still and some fifteen dismissals or acquittals for gambling offenses. Almost all of the convictions were in the state court and they resulted in small fines or probation. After a jury trial this year defendant was convicted in this court of operating a high stakes crap game and was sentenced to three years. 78 CR 19 (E.D.N. Y.). He is appealing that conviction.

The defendant's present physical health is fair. He has been hospitalized a number of times recently for various physical problems. His wife has high blood pressure and recently had heart surgery. Neither he nor any member of his family has ever experienced mental or emotional difficulties. He is polite in court and responds to questions in a low-keyed, calm fashion.

He lists his occupation as a salesman-manager for a firm which sews parts of garments; his weekly gross salary is $185.00. Income tax forms reflect his gross earnings of $9,600 for 1976, and joint earnings of $12,470 in 1975 and $15,595 in 1974. The only substantial asset he is known to have is an equity of some $30,000 in his home. He claims no bank accounts or automobiles.

**D. Judicial Notice—Organized Crime**

As we did in our prior decision in this case, 441 F.Supp. at 1288, we take judicial notice of the fact that, based on our own court records, there have been major hijacking gangs preying on interstate and international commerce at Kennedy Airport. Federal Rules of Evidence, Rule 201. There is substantial evidence that organized crime is involved in these operations which require extensive and rapid fencing. The instant hijacking falls into this general pattern.

Somewhat less clear is the connection between defendant's gambling activities and organized crime. In 1974 the Department of Justice asserted:

It is the unanimous conclusion of the President, the Congress and law enforcement officials that illegal organized gambling is the largest single source of revenue for organized crime . . . . [It] provides the initial investment for narcotic trafficking, hijacking operations, prostitution rings, and loan-shark schemes.

Statement before the Commission on the Review of the National Policy Toward Gambling, May 15, 1974 (N.T.I.S., Springfield, Va.) PB.253610, p. 5 *cited in* Reuter and Rubinstein, "Imaginary Numbers" (1978), at p. 4 (research paper funded by grants from the National Institute for Law Enforcement and Criminal Justice of the Law Enforcement Assistance Agency). *See* Kihss, "Mob's Role Discounted in Gambling," *New York Times,* June 26, 1978, p. 1, at cols. 1–2. The recently released Reuter-Rubinstein report, based on several years of study of the "structure and operation of the gambling rackets in metropolitan New York since 1965," Reuter and Rubinstein, *supra,* at p. 6, sharply disputes the Justice Department's "standard account." *Id.* at p. 8. "Most bookmakers," it concludes:

are just that, bookmakers; perhaps not the worthiest of citizens but certainly not the terrifying mobsters of whom we are told. They have few involvements in other criminal activities such as narcotics trafficking and fencing. *Id.*

We need not now mediate this disagreement about the place of gambling in the annals of crime and the significance of defendants' gambling convictions. It is sufficient for our present purposes to note that details about gambling activities of defendant attributed to the unnamed informants were confirmed in this court by the evidence in the recent gambling trial of the defendant and some of his associates. This corroborative information is useful in evaluating the probative force of the Government's evidence.

## II. LAW

### A. Sentencing.

### 1. Critical Stage of Criminal Process

Sentencing is a critical, often the most critical, stage of criminal proceedings. *See Gardner v. Florida,* 430 U.S. 349, 358, 97 S.Ct. 1197, 1205, 51 L.Ed.2d 393 (1977); *Mempa v. Rhay,* 389 U.S. 128, 134, 88 S.Ct. 254, 257, 19 L.Ed.2d 336 (1967); *United States v. Pinkney,* 179 U.S.App.D.C. 282, 290, 551 F.2d 1241, 1249 (1976); 8A Moore, Federal Practice, 32.04[4] at 32–59. In the vast majority of cases which result in a plea of guilt, it is, for the defendant, the only critical stage. *Id.* 32.04[1] at 32–50.1. *See generally,* Note, Rule 11 and Collateral Attack on Guilty Pleas, 86 Yale L.J. 1395, 1395 at n. 1 (1977); Note, The Oath in Rule 11 Proceedings, 46 Fordham 1242, 1243 n. 14 (1978) (80–95% of all criminal cases are disposed of by guilty pleas). Nevertheless, we continue to

> weave the most elaborate procedures to safeguard the rights of those who stand trial, but then treat as a casual anti-climax the perfunctory process of deciding whether, and for how long, the defendant will be locked away or otherwise "treated".

M. Frankel, "Criminal Sentences: Law Without Order," vii (1972). *See* Coffee, The Future of Sentencing Reform: Emerging Legal Issues in the Individualization of Justice, 73 Mich.L.Rev. 1361 (1975); Note, Procedural Due Process at Judicial Sentencing for Felony, 81 Harv.L.Rev. 821 (1968).

### 2. Presentence Report

The 1975 amendments to the Rules of Criminal Procedure reflect an increasing awareness of the importance of reliable information as a predicate for proper sentencing. Prior to 1966 the practice was not to reveal presentence reports to the defendant or counsel. In 1966, disclosure was made permissive. In 1975, it became mandatory. Rules of Criminal Procedure, Rule 32(c)(3)(A).

It is significant that Congress, by legislation expressing national policy, added a final sentence to the Supreme Court's proposed draft of Rule 32(c)(3)(A). It provides that, at the discretion of the court, the defendant is to be afforded the opportunity to introduce testimony or other information relating to "any factual inaccuracy contained in the presentence report." *See* 8A Moore, Federal Practice, 32.03[4], at 32–42–43, & 32.01[5], at 32–14–15 (summary of legislative history).

The Advisory Committee to the Supreme Court stated that the purpose of mandatory disclosure was to assure factual accuracy.

> The Advisory Committee is of the view that accuracy of sentencing information is important not only to the defendant but also to effective correctional treatment of a convicted offender. The best way of insuring accuracy is disclosure with an opportunity for the defendant and counsel to point out to the court information thought by the defense to be inaccurate, incomplete, or otherwise misleading. Experience in jurisdictions which require disclosure does not lend support to the argument that disclosure will result in less complete presentence reports or the argument that sentencing procedures will become unnecessarily protracted. It is not intended that the probation officer would be subjected to any rigorous examination by defense counsel, or that he will even be sworn to testify. The proceedings may be very informal in nature *unless the court orders a full hearing.*

Proposed amendments to Federal Rules of Criminal Procedure for the United States

District Courts, 62 F.R.D. 271, 325 (1974) (emphasis added). In explaining the rights of a defendant to contest the accuracy of the Government's contentions, the House Judiciary Committee wrote:

> The Committee added language to subdivision (c)(3)(A) that permits a defendant to offer testimony or information to rebut alleged factual inaccuracies in the presentence report. Since the presentence report is to be used by the court in imposing sentence and since *the consequence of any significant inaccuracy can be very serious to the defendant,* the Committee believes that *it is essential that the presentence report be completely accurate in every material respect.* The Committee's addition to subdivision (c)(3)(A) will help insure the accuracy of the present report.

Report No. 94–247 [to accompany H.R. 6799] 94th Cong., 1st Sess. 18 (1975), U.S. Code Cong. & Admin.News 1975, pp. 674, 689 (emphasis added). *Cf. Swisher v. Brady,* —— U.S. ——, ——, 98 S.Ct. 2699, 2714, 57 L.Ed.2d 705 (1978) (noting "the importance to a reliable factfinding process of hearing live witnesses.").

The typical presentence report "contains a fairly superficial summary of the biographical facts of a defendant's life." 8A Moore, Federal Practice, *op. cit. supra,* 32.-03[3] at 32–39–40. The probation officer has a brief period to make his investigation, and, burdened by a heavy caseload, can devote limited time to each report. *Id.* at 32–40. As a result, for information on the defendant's crime and criminal background, the probation officer is "likely to rely uncritically on reports supplied by the prosecutor, who cannot be expected to be disinterested." Note, Procedural Due Process at Judicial Sentencing for Felony, 81 Harv.L. Rev. 821, 837 (1968) (footnote omitted); Moore, *supra,* at 32.03[3], at 32–39. This limitation

> places an obligation on the sentencing judge, either to supplement the information in the report from other sources, a task for which judges have neither the time nor the techniques available, or else

to subject the information in the report to verification or correction.

*Id.* at 32–40 (footnote omitted).

3. Due Process Limitations on Sentencing

The history of current due process applications to sentencing is described in this court's prior opinion. *See United States v. Fatico,* 441 F.Supp. 1285, 1289–95 (E.D.N.Y. 1977). *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), which permits wide scope to a sentencing court in obtaining information through hearsay, has not been overruled by *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). Although the "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed," *Lockett v. Ohio,* —— U.S. ——, ——, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978), *Williams,* as Judge Friendly has pointed out, should not be overread to "mean that the due process clause [has] no application to mere sentencing." *Hollis v. Smith,* 571 F.2d 685, 693 (2d Cir. 1978). Reliability, though literally of vital importance in capital cases, is significant in all sentencings. It is relevant that in *Gardner* the Court relied upon due process analysis.

> Instead of relying upon the reasoning of the eighth amendment as other capital cases had, a plurality used due process analysis to invalidate nondisclosure of a presentence report. . . . The due process reasoning and its concomitant balancing test allow a defendant facing a potential prison sentence or a fine to advance liberty or property interests sufficient to require procedural protections.

Note, *Gardner v. Florida* : The Application of Due Process to Sentencing Procedures, 63 Va.L.Rev. 1281, 1297 (1977) (footnote omitted).

▬ The Circuit Courts are in fundamental agreement that:

> misinformation or misunderstanding that is materially untrue regarding a prior criminal record, or *material false assumptions as to any facts relevant to sentenc-*

*ing,* renders the entire sentencing procedure invalid as a violation of due process. *United States v. Malcolm,* 432 F.2d 809, 816 (2d Cir. 1970) (emphasis added); *United States v. Fatico,* 579 F.2d 707 at 712 (2d Cir. 1978); *United States v. Needles,* 472 F.2d 652, 657 (2d Cir. 1973); *United States v. Bass,* 175 U.S.App.D.C. 282, 290, 292–293, 535 F.2d 110, 118, 120–21 (1976) (Bazelon, C. J.); *United States v. Weston,* 448 F.2d 626, 634 (9th Cir. 1971), *cert. denied,* 404 U.S. 1061, 92 S.Ct. 748, 30 L.Ed.2d 749 (1972). "Additionally, a significant possibility of misinformation justifies the sentencing court in requiring the Government to verify the information." *United States v. Fatico, supra,* 579 F.2d at 712-713; *United States v. Weston, supra,* 448 F.2d at 634, *United States v. Bass, supra,* 175 U.S.App.D.C. at 293, 535 F.2d at 121; *United States v. Needles, supra,* 472 F.2d at 658. In such instances, "it is impermissible to place the burden of refutation on defendants." *United States v. Bass, supra,* 175 U.S.App.D.C. at 292, 535 F.2d at 120, *relying on United States v. Weston, supra,* 448 F.2d at 634; United States v. Perri, 513 F.2d at 572, 574 (9th Cir. 1975); *United States v. Stein,* 544 F.2d 96, 102 (2d Cir. 1976). Decisions about appropriate procedures to insure reliable information are left largely to the discretion of the sentencing judge. *Needles, supra,* 472 F.2d at 658; *United States v. Rosner,* 485 F.2d 1213, 1230 (2d Cir. 1973), *cert. denied,* 417 U.S. 950, 94 S.Ct. 3080, 41 L.Ed.2d 672 (1974).

In *Weston* the Court vacated the sentence and instructed the District Court that, on resentencing, it could not rely upon the information in the presentence report "unless it is amplified by information such as to be persuasive of the validity of the charge there made." *Supra,* 448 F.2d at 634. *See United States v. Fatico, supra,* 579 F.2d at 713 n. 12; *Nickens v. State,* 17 Md.App. 284, 301 A.2d 49, 52 (Ct.Spec.App.1973) (the use of hearsay allegations at sentencing required the prosecution to establish "informational reliability" to the satisfaction of the sentencing judge and to make "some showing of the credibility of the source;" the court looked in part to fourth amendment "probable cause" cases in evaluating the degree of corroboration necessary to rely on hearsay allegations); Coffee, the Future of Sentencing Reform: Emerging Legal Issues in the Individualization of Justice, 73 Mich.L.Rev. 1361, 1425–29 (1975); Note, Procedural Due Process at Judicial Sentencing for Felony, 81 Harv.L.Rev. 821, 846 (1968).

4. Protections Not Afforded the Defendant

a. The Right of Confrontation

The Court of Appeals determined that defendant does not have the right to confront key informants whose statements will be used against him at sentencing. *United States v. Fatico, supra,* 579 F.2d at 713. The inability of the defendant to cross-examine any of the seventeen informants relied upon by the Government made it difficult for him to defend against serious charges. The bias and lack of reliability, if any, of an informant could not be explored by asking specific questions about the basis for his belief, his capacity to make the observations he reported, the accuracy of his memory, his ability to communicate what he observed, and his desire and capacity to tell the truth—in short, his credibility. Under such circumstances it is difficult to assess the probative force of the information relied upon by the prosecution. The Government was able to do exactly what it was excoriated for doing in *United States v. Check,* 582 F.2d 668 at 683 (2d Cir. 1978):

> It receiv[ed] the benefit of having in effect, an additional witness against . . . [the defendant] while simultaneously insulating from cross-examination that witness, a witness whom we can safely assume would have been subjected to a scathing, and perhaps effective, cross-examination by defense counsel.

The law enforcement officers testified that the informers were independent of each other, yet gave consistent information. This corroboration increases the probability of reliability of the hearsay. *Cf. Silver v. New York Cent. R. Co.,* 329 Mass. 14, 105

N.E.2d 923 (1952) (eleven independent passengers' silence increased probative force). It still leaves lingering doubts that effective cross-examination would likely resolve. While far-fetched, it is, for example, not inconceivable that a criminal organization might leak information through a number of double agents about a person it wishes the police to destroy. That defendant has enemies among the underworld is clear. The criminal groups described by government witnesses are so bizarre as to make information from any of its associates suspect. Or, it may be that, inadvertently, the police suggested to informants the information that would be helpful and the informants obliged. *Cf.* A. Marro, "Rising Concern Over Informers Being Voiced by Legal Officials", *New York Times*, July 23, 1978, p. 1, col. 3.

#### b. Unavailability of Prior Statements

The problems of defense counsel in probing for chinks in the armor of the prosecution's witnesses was compounded by his inability to obtain prior statements of the law enforcement officials. The Court was bound by the Second Circuit's rulings that the Jencks Act—18 U.S.C. § 3500—allows the Court to order revelation of only a trial witness' statement. *See, e.g., United States v. Sebastian*, 497 F.2d 1267 (2d Cir. 1974); *United States v. Percevault*, 490 F.2d 126 (2d Cir. 1974); *United States v. Covello*, 410 F.2d 536 (2d Cir. 1969), *cert. denied*, 396 U.S. 879, 90 S.Ct. 150, 24 L.Ed.2d 136 (1969). Following the direct testimony of each of the Government's witnesses, the court rejected the defendant's demand to inspect redacted copies of the witness' relevant statements.

It is well known to trial judges that the most effective cross-examination of prosecution witnesses in criminal cases is usually based upon such statements. Denied this critical tool, defense counsel was unable to cross-examine effectively the FBI agents and detectives who relied on the informants. As the record demonstrates, he could make only the most perfunctory inquiries of the Government's witnesses. Not only did this severely disadvantage the defendant, but it diminished the court's ability to assess the credibility of both the witnesses and the extra-judicial declarants, the informants.

The questionable nature of the Second Circuit's rigidly narrow construction of the Jencks Act has been noted. *See, e.g., United States v. Covello*, 410 F.2d 536 (2d Cir.), *cert. denied*, 396 U.S. 879, 90 S.Ct. 150, 24 L.Ed.2d 136 (1969); *United States v. Sebastian*, 497 F.2d 1267 (2d Cir. 1974); *United States v. Percevault*, 61 F.R.D. 338 (E.D.N.Y.1973), *rev'd*, 490 F.2d 126 (2d Cir. 1974). The Court of Appeals for the Second Circuit concedes that the legislative history of the Act provides little guidance about the extent of its application beyond the trial stage.

> In all probability Congress did not consider the question whether a suppression hearing is itself a 'trial' or whether such a hearing is so much an integral part of the criminal trial that determines a defendant's innocence or guilt so as to intend either that the Act apply to such a hearing or that it not do so.

*United States v. Covello, supra,* 410 F.2d at 544 (2d Cir.). *See United States v. Sebastian, supra,* 497 F.2d at 1269 (2d Cir. 1974). In addition, the Court of Appeals has noted the various policy considerations that argue in favor of inspection at a pretrial suppression hearing. These include the fact that the findings at such a hearing "will often determine the result at trial and, at least in the case of fourth amendment suppression motions, cannot be relitigated later before the trier of fact  .  .  .." *United States v. Sebastian, supra,* 497 F.2d at 1270. Moreover, "a government witness at the suppression hearing may not appear at trial so that defendants could never test his credibility with the benefit of Jencks Act material." *Id.* Reliance by the Court of Appeals on possible "intimidation of witnesses," *United States v. Percevault, supra,* 490 F.2d at 131, has, of course, no bearing on a sentencing hearing where the witnesses are law enforcement officers.

Nevertheless, the Court of Appeals has refused to extend disclosure to critical criminal proceedings aside from trial.

But although we might well—as a matter of policy—favor broadening the Jencks Act or generally liberalizing federal discovery, we do not feel that we can ignore the weight of authority, including our own, or the language of the Act in the absence of contrary legislative history or specific direction from Congress.

*United States v. Sebastian, supra,* 497 F.2d at 1270. While the Court of Appeals has not considered the application of the Jencks Act to sentencing proceedings, its rationale limiting the Act solely to trials would, necessarily, apply to sentencing. *But see United States v. Murphy,* 569 F.2d 771, 774 n. 11 (3d Cir. 1978) (leaving issue open, but collecting cases suggesting "some authority for requiring Jencks material at post-trial hearings").

■ In spite of this narrow construction of the Act, the language of the original *Jencks* decision cannot be ignored. That decision, which led to the passage of the Act, suggests that the need for Jencks discovery is just as great at a sentencing hearing to determine a critical fact not established at trial that directly affects the defendant's liberty, as it would be at trial.

Every experienced trial judge and trial lawyer knows the value for impeaching purposes of statements of the witness recording the events before time dulls treacherous memory. Flat contradiction between the witness' testimony and the version of the events given in his reports is not the only test of inconsistency. The omission from the reports of facts related at the trial, or a contrast in emphasis upon the same facts, even a different order of treatment, are also relevant to the cross-examination process of testing the credibility of a witness' trial testimony.

*Jencks v. United States,* 353 U.S. 657, 667, 77 S.Ct. 1007, 1013, 1 L.Ed.2d 1103 (1957). This rationale pervades the *Jencks* decision and warrants a holding that the *Jencks* case protections should apply at the sentencing hearing in this case.

Unable to cross-examine the informants, the defendant's only hope was to attack the credibility of the Government agents by attempting to impeach them with their prior statements and reports. Without this limited weapon, the defendant remained virtually defenseless. Nor could the defendant rely on a subsequent trial to rectify any inaccurate findings. Unlike a pre-trial hearing, which may be followed by a trial at which the defendant is afforded full procedural protections, sentencing is the end of the line. The defendant has no opportunity to relitigate factual issues resolved against him. Where the facts relied upon at sentencing have already been determined at trial, this is of little, if any, consequence. But in this case, where, after a guilty plea, the critical fact was litigated for the first time at the sentencing hearing, the defendant is irreparably disadvantaged. This case suggests the wisdom of the dissenting Justices—Chief Justice Warren, Mr. Justice Brennan, Mr. Justice Black and Mr. Justice Douglas—in *Palermo v. United States,* 360 U.S. 343, 361, 79 S.Ct. 1217, 1229, 3 L.Ed.2d 1287 (1959). They wrote:

[N]othing in the [Jencks] statute or its legislative history justifies our stripping the trial judge of all discretion to make nonqualifying reports available in proper cases.

The absence of the basic protections (1) of confronting and cross-examining key extra-judicial witnesses, and (2) of obtaining material necessary to examine properly the live witnesses who reported the informants' extra-judicial statements, underscores the importance of the burden of proof protection. Before we turn to this matter it is necessary to consider the liberty interest of defendant.

**B. Liberty Interest of Defendant at Sentencing**

**1. In General**

■ A substantial liberty interest is at stake in sentencing. *United States v. Fatico,* 441 F.Supp. 1285, 1292–93 (E.D.N.Y.

1977), *rev'd on other grounds,* 579 F.2d 707 (2d Cir. 1978). The result of the increased protections for parolees and probationers "has been to make the absence of similar procedural protections at the sentencing stage appear to be an increasingly isolated anomaly." Coffee, The Future of Sentencing Reform: Emerging Legal Issues in the Individualization of Justice, 73 Mich.L.Rev. 1361, 1423 (1975).

### 2. "Special Offender" Status

Although there is loss of present liberty, and the "Due Process Clause is plainly implicated at sentencing," it "does not necessarily follow . . . that all of the procedural safeguards and strict evidentiary limitations of a criminal trial proper are required." *United States v. Fatico, supra,* 579 F.2d at 711 (citations omitted). How much protection is mandated depends in large part on the precise nature of the liberty at stake. "[E]ach stage of the criminal trial and post-conviction process must be examined independently in determining a defendant's due process rights." Id. at 711 n. 10 (citations omitted).

Courts of Appeals in this and other circuits have recognized the serious ramifications of labeling a convicted, sentenced and incarcerated defendant a "special offender." A prisoner suffers serious additional penalties when, as the result of Correction Authority and Parole Board decisions, he is so characterized because he was a participant in organized crime. *Cardaropoli v. Norton,* 523 F.2d 990 (2d Cir. 1975); *Holmes v. United States Board of Parole,* 541 F.2d 1243 (7th Cir. 1976); *Polizzi v. Sigler,* 564 F.2d 792 (8th Cir. 1977). All agree that:

> The consequences of [such] a "Special Offender" classification are significant. In most cases, the designation delays or precludes social furloughs, release to halfway houses and transfers to other correctional institutions; in some cases, the characterization may bar early parole.

*Cardaropoli v. Norton, supra,* 523 F.2d at 994. *See Holmes v. United States Board of Parole, supra,* 541 F.2d at 1250–51; *Polizzi v. Sigler, supra,* 564 F.2d at 796–97. Social furloughs, work release, transfer to Community Treatment Centers and the opportunity for early parole have been held to be "cognizable benefits extended to all prisoners," *Cardaropoli v. Norton, supra,* 523 F.2d at 994–95, which may not be denied in the absence of due process.

> The Special Offender classification works serious alteration in the inmate's conditions of confinement because it hinders or precludes eligibility for these important rehabilitative programs. We therefore conclude that the marked changes in the inmate's status which accompany the designation create a "grievous loss" . . . and may not be imposed in the absence of basic elements of rudimentary due process.

*Id.* at 995 (citations and footnotes omitted). *See, Holmes v. United States Board of Parole, supra,* 541 F.2d at 1251; *Polizzi v. Sigler, supra,* 564 F.2d at 796–97.

In mandating appropriate procedures the courts have attempted to "strike a reasonable equipoise between inmate and institutional needs." *Cardaropoli v. Norton, supra,* 523 F.2d at 997.

> The inmate's interest in insuring the accuracy of a proposed Special Offender classification must be balanced against the governmental interest in the orderly administration of the prison system.

Judge Friendly has elaborated on the balancing approach in which the court should engage:

> The required degree of procedural safeguards varies directly with the importance of the private interest affected and the need for and usefulness of the particular safeguard in the given circumstances and inversely with the burden and any other adverse consequences of affording it. Friendly, "Some Kind of Hearing", 123 U.Pa.L. Rev. 1267, 1278 (1975).

*Id.* at 995–96 (footnote omitted). The Court of Appeals in *Cardaropoli* endorsed the detailed protective procedures outlined in the district court decision by Judge Zampano. *Id.* at 996–97. But, in spite of its overriding concern about the accuracy of

the facts upon which the burdensome special offender classification is based, the Court in *Cardaropoli* did not specify what burden of proof the Government must meet. This reluctance may have stemmed from concern about the ability of prison officials to comply with technical due process requirements. No such constraints limit the sentencing judge who must determine whether persons convicted of crimes are "special offenders" deserving of more serious punishment. *See In re Ballay,* 157 U.S. App.D.C. 59, 67, 482 F.2d 648, 656 (1973) (standard of proof beyond a reasonable doubt imposes no additional burden).

A powerful argument can be made that it is the sentencing judge, not prison authorities, who should have the primary responsibility for characterizing the defendant as a special offender when the decision is predicated on events that took place prior to incarceration. The judge is certainly far more expert at evaluating the evidence and applying a legal standard governing the burden of proof. Moreover, the courtroom setting makes it relatively simple to guarantee basic procedural protections.

■ Whether or not the drafters intended this result, the newly amended Rule 32, which in most instances requires disclosure of the presentence report, will operate to shift much of this responsibility back to the sentencing judge. Disclosure of the presentence report prior to the imposition of sentence should, in many instances, result in challenge to, and resolution of, the special offender status of the defendant before imprisonment, thus obviating the need for prison authorities to make this determination. Defense counsel have an obligation to request that presentence reports be corrected lest serious errors in them be relied upon by prison or parole authorities as well as by the court to defendant's detriment. *See* Sentencing Standards for Eastern District of New York, I A 4 a, N.Y.L.J., October 15, 1977, p. 1.

■ If we utilize the balancing factors suggested by Judge Friendly and approved in *Cardaropoli,* we note that there is in one pan of the scale but a slight burden on the

sentencing judge who must supply the defendant with additional procedural protections. In the other pan, the defendant's need for such protections prior to the imposition of sentence is great. A defendant not yet sentenced has a liberty interest even stronger than that of a parolee or of a sentenced and incarcerated defendant about to be classified as a special offender.

> A defendant who is convicted but not yet sentenced . . . is in a stronger position because no authority yet has found it necessary to incarcerate him. Since a court could fine a defendant or place him on probation as easily as it could imprison him, a defendant's interest in not being deprived of his liberty at all is greater than the interest of a parolee whose liberty is already restricted.

Note, *Gardner v. Florida:* The Application of Due Process to Sentencing Procedures, 63 Va.L.Rev. 1281, 1290 (1977) (footnotes omitted). Courts recognize this stronger interest by requiring counsel at all initial sentencings but not at all parole revocations. *Compare Mempa v. Rhay,* 389 U.S. 128, 134, 88 S.Ct. 254, 256–57, 19 L.Ed.2d 336 (1967), *with Gagnon v. Scarpelli,* 411 U.S. 778, 783–91, 93 S.Ct. 1756, 1760–64, 36 L.Ed.2d 656 (1973). *See In re Ballay,* 157 U.S.App.D.C. 59, 67, 482 F.2d 648, 656 (1973).

In the instant case, the defendant, like all other defendants convicted of a crime but not yet sentenced, has this strong liberty interest at stake. Should the court determine that he is a member of organized crime, he will endure not only the "grievous loss" suffered by special offenders already incarcerated, but he will receive a substantially longer prison term.

## C. Burden of Proof

### 1. The Continuum

#### a. Burdens in General

We begin with the caution of Justice Brennan in *Speiser v. Randall,* 357 U.S. 513, 520–21, 78 S.Ct. 1332, 1339, 2 L.Ed.2d 1460 (1958), about the crucial nature of fact finding procedures:

To experienced lawyers it is commonplace that the outcome of a lawsuit—and hence the vindication of legal rights—depends more often on how the factfinder appraises the facts than on a disputed construction of a statute or interpretation of a line of precedents. Thus the procedures by which the facts of the case are determined assume an importance fully as great as the validity of the substantive rule of law to be applied. And *the more important the rights at stake the more important must be the procedural safeguards surrounding those rights.* (Emphasis supplied.)

The "question of what degree of proof is required . . . is the kind of question which has traditionally been left to the judiciary to resolve . . . ." *Woodby v. Immigration & Naturalization Serv.,* 385 U.S. 276, 284, 87 S.Ct. 483, 487, 17 L.Ed.2d 362 (1966).

> Broadly stated, the standard of proof reflects the risk of winning or losing a given adversary proceeding or, stated differently, the certainty with which the party bearing the burden of proof must convince the factfinder.

*In re Ballay,* 157 U.S.App.D.C. 59, 73, 482 F.2d 648, 662 (1973).

As Justice Harlan explained in his concurrence in *In re Winship,* 397 U.S. 358, 370, 90 S.Ct. 1068, 1075–76, 25 L.Ed.2d 368 (1970), the choice of an appropriate burden of proof depends in large measure on society's assessment of the stakes involved in a judicial proceeding.

> [I]n a judicial proceeding in which there is a dispute about the facts of some earlier event, the factfinder cannot acquire unassailably accurate knowledge of what happened. Instead, all the factfinder can acquire is a belief of what *probably* happened. The intensity of this belief—the degree to which a factfinder is convinced that a given act actually occurred—can, of course, vary. In this regard, a standard of proof represents an attempt to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual

conclusions for a particular type of adjudication. Although the phrases "preponderance of the evidence" and "proof beyond a reasonable doubt" are quantitatively imprecise, they do communicate to the finder of fact different notions concerning the degree of confidence he is expected to have in the correctness of his factual conclusions. (Emphasis in original.)

Thus, the burden of proof in any particular class of cases lies along a continuum from low probability to very high probability. *See, e.g., United States v. Schipani,* 289 F.Supp. 43, 56–57 (E.D.N.Y.1968), *aff'd,* 414 F.2d 1262 (2d Cir. 1969); Maguire et al., Cases and Materials on Evidence 1034–40 (6th ed. 1973).

b. Preponderance of the Evidence

██ As a general rule, a "preponderance of the evidence"—more probable than not—standard is relied upon in civil suits where the law is indifferent as between plaintiffs and defendants, but seeks to minimize the probability of error.

> In a civil suit between two private parties for money damages, for example, we view it as no more serious in general for there to be an erroneous verdict in the defendant's favor than for there to be an erroneous verdict in the plaintiff's favor. A preponderance of the evidence standard therefore seems peculiarly appropriate for, as explained most sensibly, it simply requires the trier of fact "to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence."

*In re Winship,* 397 U.S. 358, 371–72, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970) (Harlan concurring) (footnotes omitted). Quantified, the preponderance standard would be 50 + % probable. *United States v. Schipani,* 289 F.Supp. 43, 56 (E.D.N.Y. 1968), *aff'd,* 414 F.2d 1262 (2d Cir. 1969); Maguire et al., Cases and Materials on Evidence, 871–73 (6th ed. 1973). *But cf.* M. Finkelstein, Quantitative Methods in Law, 59–78 (1978) (equalization of errors between parties may

require higher probability than minimization of errors—i. e., more than 50 + %).

██ The preponderance of the evidence test has also been used to determine the admissibility of evidence under the constitutional exclusionary rules. *See Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972) (plurality opinion) (voluntariness of a confession); *United States v. Matlock,* 415 U.S. 164, 178 n. 14, 94 S.Ct. 988, 996 n. 14, 39 L.Ed.2d 242 (1974) (fourth amendment suppression). *Cf. Franks v. Delaware,* —— U.S. ——, ——, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) (preponderance standard used used to challenge affidavit supporting a search warrant). In *Lego,* the Court explained that the procedures to determine the validity of a confession are "designed to safeguard the right of an individual, entirely apart from his guilt or innocence, not to be compelled to condemn himself by his own utterances." 404 U.S. at 486, 92 S.Ct. at 625. The jury must still determine the "accuracy or weight of confessions admitted into evidence." *Id.* The Court thus concluded that:

> Since the purpose that a voluntariness hearing is designed to serve has nothing whatever to do with improving the reliability of jury verdicts, we cannot accept the charge that judging the admissibility of a confession by a preponderance of the evidence undermines the mandate of *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

*Id. See, e. g., Tanner v. Vincent,* 541 F.2d 932, 937 n. 6 (2d Cir. 1976), *cert. denied,* 429 U.S. 1065, 97 S.Ct. 794, 50 L.Ed.2d 782 (1977) (under New York State law the judge at the *Huntley* hearing must find voluntariness beyond a reasonable doubt); *United States v. Miley,* 513 F.2d 1191, 1201 (2d Cir. 1975), *cert. denied sub nom., Goldstein v. United States,* 423 U.S. 842, 96 S.Ct. 74, 46 L.Ed.2d 62 (1975) (voluntariness of consent for search). *See generally,* Saltzburg, Standard of Proof and Preliminary Questions of Fact, 27 Stan.L.Rev. 271, 305 (1975) (suggesting that the Court's *Lego* rule be altered to provide that the beyond a reasonable doubt standard be substituted for the preponderance standard "whenever

the defendant can demonstrate a need for protection that overrides any countervailing concerns of the criminal justice system.").

██ After sentencing, the defendant does not retain the opportunity to relitigate some questions that he has after an adverse pre-trial determination. In addition, in the case before us, the facts critical to sentencing are hardly collateral; they cut to the heart of the defendant's liberty. *Cf. Roviaro v. United States,* 353 U.S. 53, 60–61, 77 S.Ct. 623, 628, 1 L.Ed.2d 639 (1957); *McCray v. Illinois,* 386 U.S. 300, 313–14, 87 S.Ct. 1056, 1064, 18 L.Ed.2d 62 (1967); *Cooper v. California,* 386 U.S. 58, 62 n. 2, 87 S.Ct. 788, 791, 17 L.Ed.2d 730 (1967) (informer may not be immunized from effective attack by defendant if this information is crucial to a "substantive" rather than a "procedural" decision); Rule 510 of the proposed Rules of Evidence promulgated by the Supreme Court, but not adopted by Congress. Since the factual determination of the sentencing judge is final, the defendant deserves substantial protection, including a burden of proof higher than that used in negligence cases.

### c. Clear and Convincing Evidence

██ In some civil proceedings where moral turpitude is implied the courts utilize the standard of "clear and convincing evidence"—a test somewhat stricter than preponderance of the evidence. *See, e.g., Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 331–32, 94 S.Ct. 2997, 3003, 41 L.Ed.2d 789 (1974) (libel); *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 50–52, 91 S.Ct. 1811, 1823–24, 29 L.Ed.2d 296 (1971) (libel); *Tippett v. State of Maryland,* 436 F.2d 1153, 1165–66 (4th Cir. 1971) (Delinquency Act) (Sobeloff, J., concurring and dissenting in part); *Collins Securities Corp. v. SEC,* 562 F.2d 820, 824–26 (D.C. Cir. 1977) (securities fraud); 9 Wigmore, Evidence § 2498, p. 329 (3d ed. 1940) (fraud, undue influence, parol or constructive trust). *See also* civil commitment cases cited in section II (C)(e), *infra.*

██ Where proof of another crime is being used as relevant evidence pursuant to

Rules 401 to 404 of the Federal Rules of Evidence, the most common test articulated is some form of the "clear and convincing" standard. *See, e. g., United States v. Trevino,* 565 F.2d 1317 (5th Cir. 1978), *cert. denied,* 435 U.S. 971, 98 S.Ct. 1613, 56 L.Ed.2d 63 (1978); *United States v. Maestas,* 554 F.2d 834 (8th Cir. 1977), *cert. denied,* 431 U.S. 972, 97 S.Ct. 2936, 53 L.Ed.2d 1070 (1977). A panel of the Ninth Circuit has even suggested a beyond a reasonable doubt test. *United States v. Testa,* 548 F.2d 847, 851 n. 1 (9th Cir. 1977). The Second Circuit applies a preponderance of the evidence test. *See United States v. Leonard,* 524 F.2d 1076, 1090–91 (2d Cir. 1975); *United States v. Kahan,* 572 F.2d 923, 932 (2d Cir. 1978). These standards are designed to give defendants added protection not fully afforded by Rules 403 and 404. Since the crimes are merely evidence of intermediate propositions, not material elements of a crime being tried or of a sentence, there is theoretically no reason why any burden must be met as long as Rule 401's test of relevancy is satisfied—that is, the evidence has any tendency to make the material proposition "more probable or less probable than it would be without the evidence." *See United States v. Schipani,* 289 F.Supp. 43, 56 (E.D.N.Y. 1968), *aff'd,* 414 F.2d 1262 (2d Cir. 1969). The organized crime charge before us is more akin to a material proposition than to an intermediate evidentiary proposition. The line of cases dealing with other crime evidence is, therefore, not useful in determining an appropriate burden of proof on sentencing.

Quantified, the probabilities might be in the order of above 70% under a clear and convincing evidence burden.

### d. Clear, Unequivocal and Convincing Evidence

"[I]n situations where the various interests of society are pitted against restrictions on the liberty of the individual, a more demanding standard is frequently imposed, such as proof by clear, unequivocal and convincing evidence." *In re Ballay,* 157 U.S.App.D.C. 59, 73, 482 F.2d 648, 662 (1973). The Supreme Court has applied this stricter standard to deportation proceedings, *see Woodby v. Immigration & Naturalization Serv.,* 385 U.S. 276, 285–86, 87 S.Ct. 483, 487–88, 17 L.Ed.2d 362 (1966), denaturalization cases, *see Baumgartner v. United States,* 322 U.S. 665, 64 S.Ct. 1240, 88 L.Ed. 1525 (1944); *Chaunt v. United States,* 364 U.S. 350, 81 S.Ct. 147, 5 L.Ed.2d 120 (1960), and expatriation cases, *see Gonzales v. Landon,* 350 U.S. 920, 76 S.Ct. 210, 100 L.Ed. 806 (1955); *Nishikawa v. Dulles,* 356 U.S. 129, 78 S.Ct. 612, 2 L.Ed.2d 659 (1958). In *Woodby,* the Court explained:

To be sure, a deportation proceeding is not a criminal prosecution. But it does not syllogistically follow that a person may be banished from this country upon no higher degree of proof than applies in a negligence case. This Court has not closed its eyes to the drastic deprivations that may follow when a resident of this country is compelled by our Government to forsake all the bonds formed here and go to a foreign land where he often has no contemporary identification.

*Supra,* 385 U.S. at 285, 87 S.Ct. at 487–88 (citations omitted). *See* Friendly, Some Kind of Hearing, 123 U.Pa.L.Rev. 1267, 1296–97 (1975). In terms of percentages, the probabilities for clear, unequivocal and convincing evidence might be in the order of above 80% under this standard. *See* section II(C)(3) *infra.*

### e. Proof Beyond a Reasonable Doubt

The standard of "proof beyond a reasonable doubt" is constitutionally mandated for elements of a criminal offense. *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). *Cf. Gagnon v. Scarpelli,* 411 U.S. 778, 789 n. 12, 93 S.Ct. 1756, 1763 n. 12, 36 L.Ed.2d 656 (1973) (because a probationer or parolee is "already-convicted," proof beyond a reasonable doubt standard not needed in revocation hearing). Writing for the majority in *Winship,* Justice Brennan enumerated the "cogent reasons" why the " 'reasonable-doubt' standard plays a vital role in the American scheme of criminal

procedure" and "is a prime instrument for reducing the risk of convictions resting on factual error." *Id.* at 363, 90 S.Ct. at 1072.

The accused during a criminal prosecution has at stake interest of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction. Accordingly, a society that values the good name and freedom of every individual should not condemn a man for commission of a crime when there is reasonable doubt about his guilt. As we said in *Speiser v. Randall,* supra, 357 U.S. at 525–526, 78 S.Ct., at 1342; "There is always in litigation a margin of error, representing error in fact finding, which both parties must take into account. Where one party has at stake an interest of transcending value—as a criminal defendant his liberty—this margin of error is reduced as to him by the process of placing on the other party the burden of * * * persuading the factfinder at the conclusion of the trial of his guilt beyond a reasonable doubt. Due process commands that no man shall lose his liberty unless the Government has borne the burden of * * * convincing the factfinder of his guilt." . . .

Moreover, use of the reasonable-doubt standard is indispensable to command the respect and confidence of the community in applications of the criminal law. It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned.

*Id.* at 363–64, 90 S.Ct. at 1072–73. *See generally,* Underwood, The Thumb on the Scales of Justice: Burdens of Persuasion in Criminal Cases, 86 Yale L.J. 1299 (1977).

▇ In capital cases, the beyond a reasonable doubt standard has been utilized for findings of fact necessary to impose the death penalty after a finding of guilt. *See Gregg v. Georgia,* 428 U.S. 153, 164, 96 S.Ct. 2909, 2921, 49 L.Ed.2d 859 (1976); *Jurek v. Texas,* 428 U.S. 262, 269, 96 S.Ct. 2950, 2955, 49 L.Ed.2d 929 (1976).

Many state courts, in interpreting state recidivism statutes, have held that proof of past crimes must be established beyond a reasonable doubt. *See, e.g., Smith v. State,* 243 Ind. 74, 181 N.E.2d 520, 522 (1962); *State v. Martin,* 336 S.W.2d 394, 397 (Mo. 1960); *People v. Reese,* 258 N.Y. 89, 179 N.E. 305, 308 (1932) (Cardozo, C. J.); *see also In re Yurko,* 10 Cal.3d 857, 862, 112 Cal.Rptr. 513, 516, 519 P.2d 561, 564 (1974) (en banc) (dictum); Note, Recidivist Procedures, 40 N.Y.U.L.Rev. 332, 341–42 & n. 59 (1965); Note, The Constitutionality of Statutes Permitting Increased Sentences for Habitual or Dangerous Criminals, 89 Harv. L.Rev. 356, 383 n. 140 (1975) (citing these and other cases).

In civil commitment cases, where the stakes most resemble those at risk in a criminal trial, some courts have held that the beyond a reasonable doubt standard is required. *See In re Ballay,* 157 U.S.App. D.C. 59, 482 F.2d 648 (1973); *Suzuki v. Quisenberry,* 411 F.Supp. 1113 (D.Hawaii 1976); *Lessard v. Schmidt,* 349 F.Supp. 1078 (E.D.Wis.1972), *vacated on other grounds,* 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974). Others indicate a clear and convincing test will suffice. *See, French v. Blackburn,* 428 F.Supp. 1351 (M.D.N.C.1977); *Doremus v. Farrell,* 407 F.Supp. 509 (D.Neb. 1975); *Stamus v. Leonhardt,* 414 F.Supp. 439 (S.D.Iowa 1976); *Hollis v. Smith,* 571 F.2d 685, 695 n. 9 (2d Cir. 1978) (citing these cases); Note, The Constitutionality of Statutes Permitting Increased Sentences for Habitual or Dangerous Criminals, 89 Harv. L.Rev. 356, 383 n. 140 (1975) (citing additional cases).

If quantified, the beyond a reasonable doubt standard might be in the range of 95 + % probable. *United States v. Schipani,* 289 F.Supp. 43, 57 (E.D.N.Y. 1968), *aff'd,* 414 F.2d 1262 (2d Cir. 1969). See further discussion in section II(C)(3), *infra.*

2. Preponderance Standard of the "Dangerous Special Offenders" Act.

▇ Only "a preponderance of the information" produced at a hearing after a plea or finding of guilt is needed to prove that a

defendant is a "dangerous special offender" as a basis for an enhanced sentence. 18 U.S.C. § 3575(b). Sentences up to twenty-five years may follow such a finding. 18 U.S.C. § 3575(b). *See generally, United States v. Bowdach,* 561 F.2d 1160, 1171 (5th Cir. 1977).

The statute provides three categories of factual predicates.

1. Two previous felony convictions, imprisonment for one of these felonies, and less than five years elapsed between the commission of the present felony and the defendant's release from imprisonment or his commission of the last previous felony.

2. Triggering offense part of a criminal pattern of conduct which provided a substantial source of income to the defendant, and in which he manifested special skill or expertise.

3. Triggering offense a conspiracy, or in furtherance of a conspiracy, involving three or more other persons in a pattern of criminal conduct initiated, organized, planned, financed, directed, managed, or supervised by defendant or bribe or force used.

18 U.S.C. § 3575(e). The facts required to be proved are technically defined. A substantial source of income is, for example, the minimum wage for a forty-hour, fifty-week year.

■ One reason this statute probably was not relied upon by the Government is that it is doubtful that it could demonstrate that the defendant fits within any of the three precise categories the statute prescribes. A more important reason is that notice must be given "a reasonable time" before trial or plea. 18 U.S.C. § 3575(a). This requirement is designed to advise defendant of the risk he runs should he plead guilty. *See* Federal Rules of Criminal Procedure, Rule 11(c)(1). Given the evidence against him and the prior hung jury, had he been faced with a twenty-five year sentence it is doubtful that this defendant would have pled guilty. This conclusion is suggested by eleventh-hour motions defendant, Daniel Fatico, and his brother, Car-mine, have made to withdraw their pleas of guilt on the ground that,

> Had the Government made . . . an announcement . . . that they intended to establish that I was a high-ranking member of Organized Crime, I would not have pled guilty, but would have instead defended myself at a trial, where formal rules of evidence and procedure prevailed.

These motions were denied. More than a year, an appeal, and a full evidentiary hearing followed the original pleas. Under these circumstances, disappointment over the extent of a sentence that is within statutory limits is not a proper ground for setting aside a plea of guilt. *See United States v. Michaelson,* 552 F.2d 472, 475 (2d Cir. 1977); *United States v. Needles,* 472 F.2d 652, 655–656 (2d Cir. 1973); *United States v. Barker,* 168 U.S.App.D.C. 312, 323, 514 F.2d 208, 219 (1975), *cert. denied,* 421 U.S. 1013, 95 S.Ct. 2420, 44 L.Ed.2d 682 (1975).

■ By not proceeding under the statute, the Government has also deprived the defendant of the considerable procedural protections it affords. *See United States v. Stewart,* 531 F.2d 326, 332 (6th Cir.), *cert. denied,* 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 376 (1976). "[T]he Act provides far more due process protection for a convicted offender at a hearing on an enhanced sentence than is required in normal criminal prosecutions in either state or federal jurisdictions . . . ." *United States v. Ilaqua,* 562 F.2d 399, 403 n.7 (6th Cir. 1977). We need not, therefore, consider the constitutional validity of the portion of the statute that might apply to defendant. *See United States v. Neary,* 552 F.2d 1184, 1193 (7th Cir. 1977), *cert. denied,* 434 U.S. 864, 98 S.Ct. 197, 54 L.Ed.2d 139 (1978) (refusing to consider constitutionality of subdivision (e)); *United States v. Williamson,* 567 F.2d 610, 613 (4th Cir. 1977) (same); and *United States v. Bowdach,* 561 F.2d 1160, 1174–75 (5th Cir. 1977) (considering constitutionality of § 3575(e)(1) and (f) only); *United States v. Stewart,* 531 F.2d 326 (6th Cir.), *cert. denied,* 426 U.S. 922, 96 S.Ct. 2629, 49

L.Ed.2d 376 (1976) (same). *See also United States v. Duardi*, 384 F.Supp. 874, 882 (W.D. Mo.1974), *aff'd on other grounds*, 529 F.2d 123 (8th Cir. 1975) ("The government's notion that it may make and establish by a 'preponderance of the information' new criminal charges in a Section 3575–3578 sentencing proceeding in order to justify further criminal punishment is untenable.").

3. Higher Sentence Based on Proof of a Fact Not Established in Criminal Trial

In 1967 the Supreme Court decided *Specht v. Patterson*, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326. Specht had been convicted for taking indecent liberties, under a Colorado statute that carried a maximum sentence of 10 years. A separate statute, the Sex Offenders Act, provided that if the trial court was "of the opinion that [a] . . . person (convicted of specified sex offenses), if at large, constitutes a threat of bodily harm to members of the public, or is an habitual offender and mentally ill," he might receive an indeterminate sentence of from one day to life. Characterizing the invocation of the Colorado Sex Offenders Act as "the making of a new charge leading to criminal punishment," the Court held that the defendant must be afforded substantial due process. *Id.* at 610, 87 S.Ct. at 1212.

> Due process, in other words, requires that he be present with counsel, have an opportunity to be heard, be confronted with witnesses against him, have the right to cross-examine, and to offer evidence of his own. And there must be findings adequate to make meaningful any appeal that is allowed.

*Id.*

More recently, the Second Circuit in an opinion by Judge Friendly, decided a case similar to *Specht* involving a New York sex offender statute. *Hollis v. Smith*, 571 F.2d 685, 688 (2nd Cir. 1978). Unlike the Colorado statute, New York's did not, on its face, require proof of a new fact before imposition of the indeterminate sentence. Rather, it "simply enlarged the court's sentencing discretion without any standards whatever . . . ." from a maximum of five years

to a maximum of life. *Id.* at 688. The state courts, however, had interpreted the statute to require a psychiatric study and finding that the defendant is a danger to society or is capable of benefiting from confinement.

In *Hollis v. Smith*, the Second Circuit determined that due process requires proof of the critical fact at issue by "clear, unequivocal and convincing evidence." 571 F.2d 685, 695–96 (2d Cir. 1978). It found the evidence relied upon for the longer sentence did not measure up to that standard and granted a writ of habeas corpus.

In the instant case, proof by the Government that the defendant is a member of organized crime was not established in the criminal trial. As in *Hollis*, proof of this critical fact will result in a substantially longer period of incarceration. But, unlike *Hollis*, proof of the fact is not a previously defined prerequisite to a longer sentence. This difference, however, is of little consequence and Judge Friendly did not base his holding on it.

> [T]he potential unfairness to defendant may be equally as great when an increase in sentence is based on facts not specified by the legislature as when the legislature has specifically delineated standards.
> . . .

Note, The Constitutionality of Statutes Permitting Increased Sentences for Habitual or Dangerous Criminals, 89 Harv.L.Rev. 356, 375 (1975).

Following what we believe to be the letter and spirit of *Hollis*, and the need to protect critical rights of liberty, we hold that when the fact of membership in organized crime will result in a much longer and harsher sentence, it must be established by "clear, unequivocal and convincing evidence." Cf. Note, Burdens of Proof at Sentencing, 66 Geo.L.J. 1515 (1978) (clear and convincing). Since this is a federal conviction, not a habeas corpus proceeding, we need not determine whether this holding rests on due process, as Judge Friendly suggests, or upon the judicial responsibility to properly administer litigation. *Woodby v. Immigration & Naturalization Serv.*, 385 U.S. 276, 284, 87 S.Ct. 483, 487, 17 L.Ed.2d 362 (1966).

It is important to note that we do not hold that this standard of proof is fixed for all possible disputed facts at sentencing. Where the sentencing judge will give a matter only slight weight, a preponderance standard might be suitable. In some instances, for example, a dispute may arise about how much support a defendant gave an estranged wife and, since the matter might require an extensive and bitter hearing, some rough approximation based on 50 + % probabilities will normally satisfy everyone. *Cf. United States v. Sneath*, 557 F.2d 149, 150 (8th Cir. 1977) (collateral issue on sentence does not require "trial-type inquiry"). If the defendant challenges what the judge regards as a peripheral issue, the normal practice is for the court to state that it will assume defendant's version for the purposes of sentencing. At the other end of the spectrum, where there is a dispute about a recent serious felony conviction, ease of proof suggests that the court should require proof beyond a reasonable doubt if its existence will enhance the sentence. *Cf. United States v. Tucker*, 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972).

Flexibility is even reflected in the standard charge on reasonable doubt—"a doubt sufficient to cause a prudent person to hesitate to act in the most important affairs of his life." *Holt v. United States*, 218 U.S. 245, 254, 31 S.Ct. 2, 6–7, 54 L.Ed. 1021 (1910); 1 E.J. Devitt and C.B. Blackmar, Federal Jury Practice and Instructions § 11.14, p. 310 (4th ed. 1977). The charge gives the trier considerable freedom to require greater probability for more important issues. As Professor Friedman sensibly observed, confirming what judges see happening in the courtroom:

> [J]udges and jurors alike must be "satisfied" of the truth of allegations or denials of fact. What amounts to satisfaction will vary with the issues involved. The more trivial the question, the more easily and swiftly will satisfaction materialize. The more momentous and serious its consequences, the greater the caution and deliberation demanded, that is, the greater the amount of cogent evidence before there can be any "satisfaction" about where the truth lies.

Friedman, Standards of Proof, 33 Can.Bar Rev. 665, 670 (1955).

The issue of membership in an organized crime family may be even more important than a prior conviction—and problems of proof are much more difficult. Considering the need to avoid extended sentencing hearings, the standard suggested by the Second Circuit in *Hollis* is appropriate. As indicated below, most judges in this district would place the probabilities of a "beyond a reasonable doubt" standard lower than would this court and would not find the *Hollis* test particularly high. For this and other reasons, this court believes a "beyond a reasonable doubt" burden more consonant with the tradition of American due process. Based on cases in this Circuit, however, *Hollis* probably articulates the highest burden acceptable to the Court of Appeals. Any lower standard under the circumstances would be imprudent. Kadish, Legal Norm and Discretion in the Police and Sentencing Process, 75 Harv.L.Rev. 904, 923 (1962). "The moral force of the criminal law [should] not be diluted by a standard of proof that leaves men in doubt whether innocent men are being condemned." *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970). As Chief Judge Cardozo so aptly put the matter: "[T]he genius of our criminal law is violated when punishment is enhanced in the face of a reasonable doubt as to the facts leading to enhancement." *People v. Reese*, 258 N.Y. 89, 179 N.E. 305, 308 (1932).

Professor Underwood, in a recent article cites a number of studies suggesting that judges, as well as laymen, will not always make the fine distinctions between preponderance, clear and convincing, clear unequivocal and convincing, and beyond a reasonable doubt described in this and other opinions. The Thumb on the Scales of Justice: Burdens of Persuasion in Criminal Cases, 86 Yale L.J. 1299, 1311 (1977). Those interviewed placed the probability standard higher than would be expected on theoretical grounds for a preponderance and somewhat lower than might be expected for

beyond a reasonable doubt, indicating a narrower range in which to insert the two intermediate burdens.

[A]lmost a third of the responding judges put 'beyond a reasonable doubt' at 100%, another third put it at 90% or 95%, and most of the rest put it at 80% or 85%. For the preponderance standard, by contrast, over half put it between 60% and 75%. Questionnaires sent to jurors and students produced slightly lower results for the reasonable doubt instruction, and rather higher results for the preponderance standard; still, for most people the distinction was clear.

(Footnotes omitted). *But cf.* H. Kalven, Jr. and H. Zeisel, The American Jury, 187 (1966) ("the jury takes more generously than the judge the law's admonition not to convict unless guilt is proved beyond a reasonable doubt"); W. B. Fairley and F. Mosteller, Statistics and Public Policy, 182 (1977) (Harvard Business School students; "very high probability" and "practically certain" have median quantitative meaning of 90%, but distributions show "practically certain" "is generally a higher number.").

A survey of district judges in the Eastern District of New York indicates the following assessment of probabilities:

Probabilities Associated with Standards of Proof
Judges Eastern District of New York

| Judge | Preponderance | Clear and Convincing | Clear, Unequivocal and Convincing | Beyond a Reasonable Doubt |
|---|---|---|---|---|
| 1 | 50 + % | 60–70% | 65–75% | 80% |
| 2 | 50 + % | 67% | 70% | 76% |
| 3 | 50 + % | 60% | 70% | 85% |
| 4 | 51% | 65% | 67% | 90% |
| 5 | 50 + % | Standard is Elusive and Unhelpful | | 90% |
| 6 | 50 + % | 70 + % | 70 + % | 85% |
| 7 | 50 + % | 70 + % | 80 + % | 95% |
| 8 | 50.1% | 75% | 75% | 85% |
| 9 | 50 + % | 60% | 90% | 85% |
| 10 | 51% | Cannot Estimate Numerically | | |

This wide variation confirms the wisdom of Maimonides, who justified the high probability requirement in criminal cases partly on the ground that some triers would tend to shave the barriers to a finding of guilt. He wrote:

The 290th commandment is the prohibition to carry out punishment on a high probability, even close to certainty . . . . Do not think this law unjust. For among contingent things some are very likely, other possibilities are very remote, and yet others are intermediate. The "possible" is very wide. Had the Torah permitted punishment to be carried out when the possibility is very likely—such that it is almost a necessity . . . *some might inflict punishment when the chances are somewhat more distant than that, and then when they are even further still, until they would punish and execute people unjustly on slight probability according to the judge's imagination.* Therefore, the Almighty shut this door and commanded that no punishment be carried out except where there are witnesses who testify that the matter is established in certainty beyond any doubt, and, moreover, it cannot be explained otherwise in any manner. If we do not punish on very strong probabilities, nothing can happen other than that a sinner be freed; but if punishment be done on probability and opinion it is possible that one day we might kill an innocent man—and it is better and more desirable to free a thousand sinners, than ever to kill one innocent.

Maimonides, Safer HaMitzvot, Negative Commandment 290, quoted in N. L. Rabinovich, Probability and Statistical Inference in Ancient and Medieval Jewish Literature,

111 (1973) (emphasis supplied). The view, abhoring punishment on the basis of suspicion, is common among societies which respect the rule of law. According to Professor Sandy Zabell, Professor of Statistics at the University of Chicago, the earliest reference he has found in non-religious legal literature is in the Digest:

> The Divine Trajan stated in a Rescript to Assiduus [sic] Severus: "It is better to permit the crime of a guilty person to go unpunished than to condemn one who is innocent."

Justinian, Digest, 48.19.5 (collected in 9 S. P. Scott, The Civil Law 110 (1932) (Trajan ruled A.D. 98–117)).

If, as suggested earlier in discussing the standard of "clear, unequivocal and convincing evidence," the probability is about 80%, it means we would rather have four cases decided in error against the Government than more than one against the defendant. If, in the case of proof "beyond a reasonable doubt," the figure of 95% or 99% is used, it means that we would rather have, respectively, twenty or one hundred guilty persons go free than more than one innocent person be convicted. Blackstone would have put the probability standard for proof "beyond a reasonable doubt" at somewhat more than 90%, for he declared: "It is better that ten guilty persons escape than one innocent suffer." W. Blackstone, The Law of England, Book the Fourth, Chapter 27, p. 358 (T. Wait and Co., Portland 1807). Undoubtedly both Blackstone and Maimonides had capital offenses in mind—where a mistake was generally not correctable.

The high probability required in criminal cases, however, does not mean that most guilty people who are tried are acquitted. In almost all cases the guilt is so clear or the doubt so great that precise quantification is of no moment. In some few instances—which this court would roughly estimate on the basis of experience as no more than one in ten cases—it may make a difference whether the trier's perception of the standard is 80, 90, 95, or 99%.

The standard can never be set at certainty or 100% probability, because Time is irreversible, events unique, and any reconstruction of the past at best an approximation. As a result of this lack of certainty about what happened, it is inescapable that the trier's conclusions be based on probabilities.

Maguire, et al., Cases and Materials on Evidence 1 (6th ed. 1973). Setting the standard at 100% in order to avoid any chance of convicting the innocent would thus result in a zero conviction rate and acquittal of all the guilty. As Professor Posner points out:

> If the standard of proof is set at so high a level that the probability of an innocent person's being convicted is zero, the conviction rate for guilty people will also be zero, since only with a zero conviction rate can all possibility of an innocent person's being convicted be eliminated.

Posner, An Economic Approach to Legal Procedure and Judicial Administration, 2 J. of Legal Studies 399, 411 (1973).

Quantification of these standards has not been well developed for reasons not now relevant. *See* Maguire et al., Cases and Materials on Evidence, 871–73 (6th ed. 1973) (collection of the literature). *Cf.* 9 J. H. Wigmore, Evidence (3rd Ed. 1940), § 2497, p. 325 ("no one has yet invented or discovered a mode of measurement for the intensity of human belief"). *But cf.* 1 J. Bentham, Rationale of Judicial Evidence, ch. VI, 71 ff (1827) (importance of quantitative numerical scale in expressing degrees of persuasion); T. Starkie, Law of Evidence, 753–54 (9th Am.ed. by G. Sharswood 1869 (notion that "moral probabilities could ever be represented by numbers . . . and thus subjected to arithmetical analysis, cannot but be regarded as visionary and chimerical;" but analysis developed at p. 756; adopts "maxim of law . . . that it is better that ninety-nine (i.e. an indefinite number of) offenders should escape, than that one innocent person should be condemned"); 1 W. M. Best, Law of Evidence, 97 (1st Am.Ed. by J. A. Morgan, 1878) (Bentham's suggestion "fantastic," quoting criticism by Dumont, French translator of Bentham). Nevertheless, there is little doubt that utilizing one rather than the other of

## III.  FACTS APPLIED TO LAW

The testimony originally proffered by the Government would not have proved by a preponderance, and certainly not by "clear, unequivocal and convincing evidence," that defendant is a "made" member of the Gambino family.  Montello and Llauget are hardly model witnesses.  They have extensive criminal records, long histories of association with organized crime, and for some years they have been supported by the Government in its witness protection program.  All of this leaves their credibility in doubt.  Moreover, even if believed, much of their testimony is equivocal.  The bulk of their specific testimony centered on the Fatico-Llauget-Dellacroce "sit-down."  Montello was not a party to this meeting.  Even if the "sit-down" occurred just as Llauget indicated, it is hardly conclusive of membership in the Gambino family.  Attendance at the Gambino wake is also of little probative value.  Nor is the 1966 arrest of Carmine Fatico for consorting with known criminals highly probative of his brother's alleged membership in the Gambino family.  Finally, Daniel Fatico's arrest record for such activities as burglary, bookmaking, policy, illicit manufacture of alcohol and running a disorderly house is ambiguous on the issue of organized crime; it is often the hallmark of an incompetent individual hoodlum.

When viewed with the other evidence introduced at the sentencing hearing, however, a much more compelling case is made out.  The fact that seven different government agents, four of them from the FBI, relying on a total of seventeen independent informants, testified that Daniel Fatico was a member of the Gambino family, is, in the court's view, highly probative.  Even if one or several of these experienced agents miscalculated the reliability of an informant, the large number of agents and informants, greatly reduces the margin for error.  There are also the independent police observations of the defendant and his associates consorting with criminals.  The sheer magnitude of this proof offsets to some extent the enormous handicap placed upon the defendant by the Government's nonproduction of any of the informants and its withholding of material crucial to effective cross-examination.  While we must remain dubious of any conclusions based upon hearsay, the Government's proof here meets the rigorous burden of "clear, unequivocal and convincing evidence."  The probability is at least 80% that defendant is an active member of an organized crime family.

Conclusion

For the reasons stated in this opinion, the court is not satisfied that sentencing procedures in this case—denying the production of informants and prior statements of prosecution witnesses—used to make the critical finding of fact, comport with the high standards of due process expected from this country's courts.  The court believes itself bound by applicable decisions and directions of the Court of Appeals of this Circuit to follow these procedures.

Defendant has recently been sentenced to three years on a federal gambling charge independent of the instant hijacking case.  78 CR 19–1 (E.D.N.Y.).  He is appealing from the conviction and the sentence has been stayed.

Were it not for the organized crime issue, defendant would have been sentenced in the hijacking case to no more than a three year term, concurrent with the gambling sentence.  This is in conformity with standard practice favoring concurrency.  See A.B.A. Proj. on Standards for Criminal Justice, Sentencing Alternatives and Procedures § 3.4 (iv) at pp. 171–72 (1968).  A three year concurrent sentence would take into account defendant's age, health problems, close and stable family relationships, and the fact that because his prior convictions in the state courts have almost without exception been punished by relatively small fines and probations, this is his first major taste of incarceration.  In addition, the maximum penalty is five years and defendant is entitled to some consideration for his plea of guilty.

Based on the evidence presented at the sentencing hearing, the court concludes that defendant is a member of the Gambino crime family. It sentences him to a prison term of four years to be served consecutively with the three year sentence for gambling. This new sentence is necessary for purposes of incapacitation to protect the public from further criminal conduct by the defendant, a recidivist and member of a dangerous group of well-organized criminals.

Under normal Parole Board practice, without a finding of organized crime, the Probation Department estimated that defendant would have been subject to Parole Guidelines of twelve to sixteen months for the gambling conviction. *See* Guideline Application Manual, United States Parole Commission Research Unit Report Sixteen (November 1977) (Adopted by the Commission as Appendix 4 United States Parole Commission Manual—May 1, 1978). He probably would have been kept in a medium or low security prison in Danbury, Connecticut or Allenwood, Pennsylvania, where he could be conveniently visited by his family. In about a year he probably would have been released to a half-way house in New York City where he would have been able to work during the day, see his family each evening, and spend weekends at home.

Given the finding of organized crime and the consecutive sentences, the chances of early parole are reduced to the vanishing point. Defendant will probably spend some six years in a penitentiary even with time off for good behavior. He will probably be sent to a secure facility such as Atlanta. Within the prison he will be treated as a person with dangerous potential, probably finding it more difficult to obtain furloughs and other privileges. In short, the result of the finding of organized crime membership will probably be five extra years of hard service in a high security prison far from his family.