UNITED STATES of America

v.

Daniel M. TROPIANO, Defendant.

No. 93–CR–1362.

United States District Court,
E.D. New York.

Aug. 1, 1995.

The Legal Aid Society, Federal Defender Division by Mark B. Gombiner, Jason Solotaroff, Brooklyn, NY, for defendant.

Zachary W. Carter, United States Attorney, E.D.N.Y. by Paul T. Weinstein, Julie E. Katzman, Brooklyn, NY, for United States.

I. INTRODUCTION........................................ 92
II. FACTS AND PROCEDURAL HISTORY.............................. 92
 A. Events occurring prior to appeal................................... 92
 B. Court of appeals opinion......................................... 93
 1. § 5K2.0 departures............................................ 93
 2. § 4A1.3 departures............................................ 94
 C. Additional facts proven on remand................................. 95
III. LAW..................................................... 96
 A. Past versus future recidivism....................................... 96
 B. Relevance of other criminal acts................................... 96
 C. Inconsistency with purposes of sentencing........................... 97
 D. Inconsistency with Guidelines..................................... 97
 E. Inconsistency with *Witte*......................................... 99
 F. Remaining distinctions between horizontal and vertical departures after *Witte*................................................ 100
 G. Applying present court of appeals' rules, what can be considered under § 4A1.3?................................................ 100

H. Applying present court of appeals' rules, what can be considered under § 5K2.0? ...................................................... 101
I. Applying present court of appeals' rules, what can't the court consider? 102
J. Conclusion on law ................................................... 102
IV. APPLICATION OF LAW TO FACTS ............................... 103
A. Relevant conduct ............................................... 103
B. Criminal history ............................................... 104
V. CONCLUSION ..................................................... 104

## AMENDED MEMORANDUM AND ORDER

WEINSTEIN, Senior District Judge.

## I. INTRODUCTION

The defendant was convicted after trial of possessing vehicles with altered vehicle identification numbers (VINs). At sentencing, the court found that the defendant had committed a number of uncharged crimes. It weighed these acts, which reflected on both the character of the offense and the character of the offender, in determining the appropriate sentence.

The court of appeals vacated the sentence and remanded. *United States v. Tropiano*, 50 F.3d 157 (2d Cir.1995). Drawing a sharp distinction between two uses of other criminal acts under the Guidelines—determining the vertical offense level under the "relevant conduct" provision and computing the horizontal "criminal history" category—it held that the sentencing court had failed to clarify the factual basis for the former and to follow procedures required for the latter.

Subsequently, the Supreme Court, in *Witte v. United States*, —— U.S. ——, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995), rejected the court of appeals' notion that there is a bright-line distinction between relevant conduct and criminal history. The view of the Court in *Witte* that the same findings may be relevant to both determinations—reflecting a proper understanding of the holistic, rather than atomistic, factfinding required of sentencing judges—is inconsistent with the *Tropiano* holding and cases on which it is based. Nevertheless, while awaiting reaction by the court of appeals to the *Witte* decision, this court resentences the defendant pursuant to the mandate.

## II. FACTS AND PROCEDURAL HISTORY

### A. Events occurring prior to appeal

According to an informant, Tropiano arranged for cars to be stolen and then altered their VINs. Agents obtained a search warrant for two premises leased by Tropiano. In one, they found a Cadillac with an altered VIN, which they towed to an FBI garage. In the other, agents found another car with an altered VIN. Both cars had been stolen.

Inside the Cadillac they found the original motor vehicle titles to two other cars; their VINs were the numbers used on the Cadillac and the other stolen car. The agents also found records reflecting a series of cocaine sales and material associated with cocaine dealing: a digital scale, a calculator, a grinder, assorted plastic envelopes, and boric acid and lydocade hypochloride (the usual cutting agents for cocaine). They also discovered a semi-automatic pistol and ammunition, as well as various forged documents.

At Tropiano's trial, one of the defendants' cocaine customers, Philip Stines, testified that he obtained the re-VIN-ed Cadillac from Tropiano, who told him it had been stolen. Acting under the defendant's instructions, Stines insured the Cadillac, gave it back to Tropiano, reported it stolen, and collected the insurance proceeds. Stines gave $1,000 of the proceeds to Tropiano.

Tropiano was found guilty of possessing two vehicles with altered VINs. 18 U.S.C. § 511(a). At sentencing, the government moved for an upward departure on the basis of the defendant's uncharged drug offenses and other criminal conduct.

The court conducted a *Fatico* hearing. *See United States v. Fatico*, 458 F.Supp. 388 (E.D.N.Y.1978), *aff'd*, 603 F.2d 1053 (2d Cir. 1979), *cert. denied*, 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980). Three witnesses testified for the government.

Phillip Stines swore that he regularly purchased cocaine from Tropiano. He also testified that the $1,000 he gave to Tropiano after the insurance scam on the re-VIN-ed Cadillac settled a cocaine debt he owed Tropiano. In addition, Stines described Tropiano's method of processing and bagging cocaine for sale. Stines also identified the scale seized from the Cadillac's trunk as the type he had seen Tropiano use in connection with his cocaine business. Stines' testimony was buttressed by records in the Cadillac revealing many sales to someone named "Phil," presumably Stines.

An FBI agent, Pedro Ruiz, testified that the scale, calculator, plastic envelopes, grinder, and cutting agents found in the Cadillac's trunk were the tools of the trade of cocaine dealers. He concluded that the records in the Cadillac's trunk reflected the sale of over one kilogram of cocaine.

Another FBI agent, Martin Finn, provided information about a stolen and retagged van recovered during the investigation of Tropiano. Finn recounted his interview with one of Tropiano's associates, Salvatore Marchese, who admitted to registering the stolen van for Tropiano in exchange for a $300 reduction of his cocaine debt. The title to this stolen van, in the name of Salvatore Marchese, was recovered from the trunk of the stolen Cadillac. Tropiano's drug records reflected numerous sales to "Sal."

According to Tropiano's presentence report, his offense level was 16. On the basis of two prior convictions—one for petty larceny and one for cocaine possession—the report assigned him a criminal history category of III. Absent other considerations, this combination of offense level and criminal history category would require a sentence of 27–33 months. The court gave notice of the possibility of an upward departure.

At sentencing, the court relied on the evidence proffered at the *Fatico* hearing in finding that Tropiano "was involved in a whole series of narcotics transactions" and that "the car deals were part of these transactions." The court then observed:

> The Defendant is a confirmed recidivist. He's 25 years old, he's at the peak of his criminal career, and he has to be sentenced primarily for incapacitation because the court is convinced that he will continue with serious criminal conduct when he's out of prison.

The court departed seven levels, to an offense level of 23, raising the sentencing range to 57–71 months. It sentenced Tropiano to 60 months' imprisonment—the maximum permitted under the statute of conviction, 18 U.S.C. 511(a)—plus three years supervised release, a $50,000 fine, and a $50 assessment.

## B. Court of appeals opinion

The court of appeals held that the sentencing court had "circumvent[ed] the strictures of a § 4A1.3 horizontal departure by treating criminal history concerns as aggravating circumstances that affect offense level under § 5K2.0." *Tropiano*, 50 F.3d at 163. In the Second Circuit, the court declared, distinctions between horizontal and vertical departures are to be strictly maintained, and "a 4A1.3 departure in the trappings of a 5K2.0 departure" is "improper[ ]." *Id.* at 159.

### 1. § 5K2.0 departures

According to the court of appeals,

> Section 5K2.0 allows [a vertical] departure for misconduct not leading to conviction if the defendant committed acts " 'related in some way to the offense of conviction. . . .' " *United States v. Uccio*, 917 F.2d 80, 86 (2d Cir.1990) (quoting *United States v. Kim*, 896 F.2d 678, 684 (2d Cir. 1990)). . . . *[M]isconduct unrelated to the offense of conviction cannot form the basis for a 5K2.0 departure. See Uccio*, 917 F.2d at 86; *Kim*, 896 F.2d at 684.

50 F.3d at 164 (emphasis added). In this case, the court of appeals found, "Tropiano had his fingers in several pies. He dealt drugs, ran a car theft and retagging ring, and defrauded an automobile insurance company." *Id.* at 164. Perhaps, the court added, he was "the mastermind of a multifaceted criminal enterprise." *Id.* Nonetheless, the connection between the offense of conviction and the other acts was, according to the court, "not intuitively obvious." *Id.* It followed, according to the court, that under the

standard of *Uccio* and *Kim,* Tropiano's prior criminal acts were unrelated and "could not form the basis of a § 5K2.0 departure." *Id.* at 162.

## 2. § 4A1.3 departures

The court reviewed the sentencing court's statements about Tropiano's recidivism and the need to sentence him "primarily for incapacitation." It held that recidivism concerns "are the core concept of criminal history, and fall squarely under § 4A1.3." *Tropiano* 50 F.3d at 163. The defendant's recidivism would have justified a horizontal departure, the court suggested, had the sentencing judge followed the "detailed procedure for making horizontal departures" required in this circuit. *Tropiano* at 163. Specifically, a sentencing judge departing horizontally must

> proceed[ ] sequentially from the criminal history category determined by the defendant's criminal history point score through each higher criminal history category until it settles upon a category that fits the defendant.... Along the way, the district court must pause at each category to consider whether that category adequately reflects the seriousness of the defendant's record. *Only upon finding a category inadequate may the court proceed to the next category.*

*Id.* at 162 (emphasis added) (citing *United States v. Stevens,* 985 F.2d 1175, 1185 (2d Cir.1993); *United States v. Jakobetz,* 955 F.2d 786, 805 (2d Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992); *United States v. Coe,* 891 F.2d 405, 412 (2d Cir.1989)).

The court conceded that "[w]e have on occasion criticized this procedure as rigid and mechanistic." *Tropiano* 50 F.3d at 162 (citing *United States v. Thomas,* 6 F.3d 960, 964–65 (2d Cir.1993); *United States v. Rodriguez,* 968 F.2d 130, 140 (2d Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 140, 121 L.Ed.2d 92 (1992)). The court of appeals for the Second Circuit has also, it noted, "refused" to require the procedure for offense level (i.e., vertical) departures. *Tropiano* 50 F.3d at 163 (citing *United States v. Campbell,* 967 F.2d 20, 25–26 (2d Cir.1992); *United States v. Hernandez,* 941 F.2d 133, 140–41 (2d Cir.1991) (upholding § 5K2.0 departure,

even though step-by-step procedure was not followed)). Nonetheless, the court held, "a district court cannot avoid this step-by-step framework 'by classifying a departure based on criminal history as [an offense level departure].'" *Tropiano* 50 F.3d at 163 (quoting *United States v. Deutsch,* 987 F.2d 878, 887 (2d Cir.1993)).

For this proposition, the court relied on *United States v. Deutsch,* 987 F.2d 878, 887 (2d Cir.1993). The *Deutsch* court stated that "Congress mandated specific procedures to be used in making a departure under [§ 4A1.3]." *Id.* at 886. Yet *Deutsch* provided no citation to a Congressional mandate—which, given the delegation by Congress to the Sentencing Commission, did not exist—and instead referred exclusively to a law review article describing early circuit court interpretations of the Guidelines. *Id.* at 887 (citing Bruce M. Selya & Matthew R. Kipp, *An Examination of Emerging Departure Jurisprudence Under the Federal Sentencing Guidelines,* 67 Notre Dame L.Rev. 1, 37–38 (1991)). The *Deutsch* court also noted that it had once required the same, step-by-step approach for vertical departures, 987 F.2d at 887 n. 3 (citing *Kim, supra,* 896 F.2d at 685), but that it had "since clarified that this procedure is not required ... but merely encouraged." *Id.* (citing *Campbell,* supra, 967 F.2d at 25). No explanation was given for the downgrading of the prior "rule" on vertical departures to a mere suggestion.

Finally, the court recognized that other circuits do not impose a sharp distinction between § 4A1.3 and § 5K2.0 departures. It stated:

> We are aware that other circuits have not adopted so rigid a demarcation between 4A1.3 and 5K2.0 departures, and those circuits will affirm 5K2.0 departures based on criminal history concerns. *See, e.g., United States v. Schmeltzer,* 20 F.3d 610, 613 (5th Cir.) (affirming 5K2.0 departure based on prior convictions for a very similar offense), *cert. denied,* 130 L.Ed.2d 540, 115 S.Ct. 634, — U.S. —— (1994); *United States v. Nomeland,* 7 F.3d 744, 747–48 (8th Cir.1993) (affirming 5K2.0 departure based on defendant's extensive and violent

criminal activity); *United States v. Molina*, 952 F.2d 514, 518–19 (D.C.Cir.1992) (similarity of offense of conviction to prior offenses permissible basis for a 5K2.0 departure).

*Tropiano* 50 F.3d at 163. Nevertheless, having traced the distinction back to 1989, the court noted that "it is too late in the day in this Circuit ... to hold that 5K2.0 departures encompass criminal history concerns, as well." *Tropiano* 50 F.3d at 163.

## C. Additional facts proven on remand

On remand, the government argued that a horizontal departure was warranted on the ground that "the defendant's criminal history as calculated pursuant to the Guidelines under-represents his true criminal history and propensity for other crimes." Government Letter, June 16, 1995, at 1. It also continued on oral argument to call for a vertical departure.

A second *Fatico* hearing was held. As proof of criminal history, the government submitted documents—including fraudulent automobile titles; automobile registrations; driver's licenses; and social security cards, one completed and one blank—obtained from the defendant. The government contended:

> [E]very time the defendant registered a vehicle in a fake name, every time he filed documents to obtain a driver's license in a fake name, every time he received a title to a car in a fake name; every time he received a registration to a vehicle registered in a fake name and every time he drove a vehicle using a driver's license in a fake name, the defendant committed a misdemeanor violation.... Moreover, by obtaining false Social Security Cards and driver's licenses, the defendant committed felony violations of 18 U.S.C. 1029(a)(1), (a)(3), and (a)(6).

Government Letter, June 16, 1995, at 4. The government, in light of Second Circuit caselaw requiring similarity for a criminal history adjustment, *see infra* Part III.G, argued that:

> [T]hese false document and motor vehicle offenses are sufficiently similar to the crime of conviction, and motivated similarly, to be relevant [to] the defendant's true

criminal history. The proof at trial showed that the defendant was an experienced and calculating retagger of automobiles, and used false identifications to obtain license plates to hide the fact that stolen automobiles had altered VINs. Therefore, the purpose behind the defendant's continuous use of false identifications and false D.M.V. documents is the same as his motivation in the crime in this case.

*Id.* at 4. On this basis, the government argued:

> Daniel Tropiano is a confirmed recidivist, who has continually committed crimes since he was old enough to have the means to do so. His criminal history category, III, which is based only on his past convictions, underrepresents his true criminal history.

*Id.* Tropiano's true criminal history, the government argued, "is at least Category V." *Id.* at 5.

In response, the defendant argued that the Guidelines do not permit the court "to enhance the defendant's criminal history category for uncharged acts of misconduct that are part of the same pattern of conduct as the instant offense." Defense Letter, June 20, 1995, at 2. For this proposition, defendant relied on *United States v. Coe*, 891 F.2d 405 (2d Cir.1989), in which the court held that bank robberies that were part of the same two-week crime spree as the offense of conviction did not qualify as "prior criminal history." *Id.* at 410. According to the defendant, "*Coe* makes clear ... that concurrent, similar acts of uncharged misconduct are not relevant to 'prior criminal history' or the likelihood of recidivism." Defense Letter at 2–3. Since Tropiano's uncharged misconduct was "inextricably intertwined" with the offense of conviction, it cannot, according to the defendant, be considered prior criminal history. *Id.* at 3.

The court notified the defendant of its intent to again consider the cocaine offenses as uncharged misconduct. The defendant—having argued that related, concurrent misconduct could not be considered criminal history—now argued that past conduct could

not be considered criminal history unless it was similar to the offense of conviction. For this proposition, it relied on the language of § 4A1.3, which lists, as one of the factors the court can take into account in computing criminal history, "prior *similar* adult criminal conduct not resulting in a conviction." U.S.S.G. 4A1.3(e) (emphasis added). Defendant's view ignores the fact that the introductory paragraph of § 4A1.3 states that the list that follows is non-exclusive. *Id. See* discussion in Part III.G, *infra.*

The court gave defendant detailed notice that at sentencing, in addition to the VIN offenses, it was considering relying on the cocaine sales, possession by defendant of a gun, insurance fraud, use of forged documents, trafficking in stolen cars, attempts to collect cocaine debts even after being found guilty by a jury, and other aspect of the defendant's conduct. A one week continuance of the *Fatico* hearing was provided to permit the defendant to respond.

## III. LAW

### A. Past versus future recidivism

The likelihood of recidivism is a universal sentencing consideration. *See* 18 U.S.C. § 3553(a)(2) (listing among factors to be weighed in imposing sentence "the need for the sentence imposed . . . to protect the public from further crimes of the defendant"). Extent of past recidivism is one—but by no means the only—factor relevant to the probability of future illegal conduct. Many other indicators having nothing to do with *past* recidivism may help predict future behavior. One is the defendant's age. Another is his or her physical condition. A third is the defendant's "risk averseness." *See United States v. Shonubi*, 895 F.Supp. 460, 489 (E.D.N.Y. 1995) (discussing relevance of risk aversion in predicting future criminal conduct). Thus the appellate court's statement that, in light of *Deutsch*, "concerns over recidivism and incapacitation fall under § 4A1.3, not § 5K2.0," *Tropiano* 50 F.3d at 163, reflects an unnecessary coarsening of what should be a subtle and nuanced process. Concerns over recidivism and incapacitation inform every phase of sentencing. At best, the appellate court was confusing past recidivism—

essentially the definition of criminal history—with "concerns over [future] recidivism and incapacitation." *Tropiano* 50 F.3d at 163 (citing *Deutsch*, 987 F.2d at 887). Arguably, the former is properly relegated to the horizontal axis; the latter is not.

### B. Relevance of other criminal acts

After *Tropiano* was decided by the court of appeals, the Supreme Court reiterated the well-accepted doctrine that, "as a general proposition, a sentencing judge 'may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come.'" *Witte v. United States*, — U.S. —, —, 115 S.Ct. 2199, 2205, 132 L.Ed.2d 351 (1995), (quoting *Nichols v. United States*, — U.S. —, —, 114 S.Ct. 1921, 1927–28, 128 L.Ed.2d 745 (quoting *United States v. Tucker*, 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972))). This statement echoes the language of 18 U.S.C. § 3661, which in turn informs the Guidelines. *See* U.S.S.G. § 1B1.4 (at sentencing, "the court may consider, without limitation, any information concerning the background, character and conduct of the defendant").

The court of appeals for the Second Circuit has attempted to consign concerns about future recidivism to the horizontal axis of the sentencing table. *See Tropiano, supra,* 50 F.3d at 163, describing *Deutsch*, 987 F.2d at 887, as holding that "concerns over recidivism and incapacitation fall under § 4A1.3, not § 5K2.0." It has offered no explanation for this distinction, which ignores the fact that offense-related conduct can be highly relevant to the need for incapacitation. *Cf. United States v. Montenegro–Rojo*, 908 F.2d 425, 430 n. 6 (9th Cir.1990) ("the very fact that the defendant continued to act in a way previously adjudicated to be wrongful . . . makes him more blameworthy the second time around," and, therefore, recidivism concerns are permissible grounds for departure under § 5K2.0).

The *Tropiano* court gave no explanation for its distinction other than the need to follow more detailed procedures when de-

parting horizontally than when departing vertically. Whether or not this is an example of *ipse dixit* or, perhaps, circular reasoning, given that the court of appeals has never adequately explained the reason for the procedural difference, the lack of a clearly-articulated rationale creates difficulties in applying the Second Circuit's rulings to new situations.

In fact, the Second Circuit's hard-and-fast distinction between what can be considered for horizontal and vertical departures requires reevaluation for at least three reasons: it is inconsistent with the theory, history, and purposes of sentencing; it is inconsistent with the language of the Guidelines; and it is inconsistent with the Supreme Court's discussion in *Witte*.

### C. Inconsistency with purposes of sentencing

One area of factfinding that was, is, and must always be relevant to sentencing is criminal conduct outside the offense of conviction. *See United States v. Wright*, 873 F.2d 437, 441 (1st Cir.1989) (Breyer, J.) (considering other criminal conduct "is a practice in which all sentencing courts have engaged in the past and in which they will continue to engage in the future."). Every presentence report details such conduct. Without this knowledge the court is not in a position to exercise its primary function—protecting the public against the probable dangerous future activity of a convicted criminal, without overpunishing the criminal.

Knowledge of past criminality helps the sentencing court understand the character of the offense *and* the character of the offender. Both are relevant to the court's decision on how best to achieve the purposes of sentencing. Both are probative of the danger posed by the defendant to society and are relevant to the proper period of incarceration. *See, e.g., Shonubi, supra*, 895 F.Supp. at 529–530 (noting dangers posed by those who commit *major* offenses and those who commit *multiple* offenses). Knowledge of the nature of prior crimes is also critical in preventing the overpunishment of a defendant when the probability of recidivism is low and general deterrence is not a significant factor.

### D. Inconsistency with Guidelines

Nothing in the Guidelines suggests the need for a rigid demarcation imposed by the court of appeals between character of the offender and character of the offense. The decision by the authors of the Guidelines to consider criminal history on one axis and related conduct on another was not even necessary to its scheme. On a single-axis system, both factors could easily have been handled by additions or subtractions to offense level. The present grid is a graphically appealing, reasonable but by no means essential method of breaking fact-finding into two broad categories. It cannot be understood to relegate every fact to one axis or the other. This is clear from a number of features of the Guidelines.

The Guidelines' general departure provision, U.S.S.G. § 5K2.0—which the court of appeals has converted into a *vertical* departure provision—states that "if the court find 'that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines ... the court may impose a sentence outside the range established by the applicable guideline." That is to say, the court may impose a higher or lower sentence.

The same Guidelines section goes on to discuss "offense characteristic[s]" and "offender characteristic[s]" without suggesting that they must be treated differently. Mention is made not of horizontal or vertical movement but of higher or lower ranges. The emphasis is on result, not procedure. *Cf. United States v. Okane*, 52 F.3d 828, 837–38 (10th Cir.1995) (McWilliams, J., concurring) ("I am of the firm view that the Sentencing Guidelines do not contemplate that ... a district court [making an upward departure should] go back, so to speak, and raise the defendant's base offense level, or his criminal history category, or both.... The district court should simply depart upward from the [original] guideline range ... and give its reasons.").

Under § 4A1.3, the Guidelines instruct that "if the criminal history category does

not adequately reflect the seriousness of the defendant's past criminal conduct ... the court may consider imposing a sentence by departing from the otherwise applicable guideline range." U.S.S.G. § 4A1.3. The section goes on to indicate that the court "use, as a reference, the guideline range for a defendant with a higher or lower criminal history category, as applicable." *Id.* That this is merely a means of assisting decision-making—but not a mandatory procedure— seems clear. As the section states:

> Where the court determines that the extent and nature of the defendant's criminal history, taken together, are sufficient to warrant an upward departure from Criminal History Category VI, the court should structure the departure by moving incrementally *down the sentencing table to the next higher offense level ... until it finds a guideline range appropriate to the case.*

U.S.S.G. § 4A1.3, ¶ 4 (as amended Nov. 1, 1992) (emphasis added). Thus, the Guidelines explicitly provide that criminal history can be accommodated by adjustment along the vertical axis.

This procedure has been approved in the Second Circuit. *See United States v. Harris,* 13 F.3d 555, 558 (2d Cir.1994). In *Harris,* the court held that the Guidelines "do not impose upon the district courts the duty to follow a rigid step-by-step approach when departing to a higher offense level under criminal history category VI." *Id.* The court noted:

> We refuse to require a "meaningless exercise" every time there is a departure. "[W]here a departure is warranted, the emphasis should be on ascertaining a fair and reasonable sentence, not on subscribing slavishly to a particular formula." Sentencing judges should not be required to conduct unnecessary procedures.

*Id.* at 559 (quoting *United States v. Aymelek,* 926 F.2d 64, 70 (1st Cir.1991)) (citations omitted).

In addition, some facts that relate primarily to the character of the offender are handled on the *vertical* axis. For example, § 3C1.1 calls for increasing offense level for obstruction of justice. *See* U.S.S.G. § 3C1.1; *United States v. Dunnigan,* —— U.S. ——,

113 S.Ct. 1111, 122 L.Ed.2d 445 (1993). Lying on the witness stand—probably the most dangerous form of obstruction—is probative of the defendant's attitude toward the law, and, therefore, of the likelihood that he or she will revert to criminal behavior. *Dunnigan,* —— U.S. at ——, 113 S.Ct. at 1119 (explaining that the purpose of the § 3C1.1 enhancement is that "[t]he perjuring defendant's willingness to frustrate judicial proceedings to avoid criminal liability suggests that the need for incapacitation ... is heightened."). This is the "recidivism" concern that the Second Circuit purports to have assigned to the horizontal axis. Conversely, according to the court of appeals, "[b]oth the language of guideline § 4A1.3 and our interpretation of that section make clear that the critical question under § 4A1.3 is whether the criminal history category adequately reflects the seriousness of the defendant's past criminal conduct *or* the likelihood that the defendant will commit other crimes." *United States v. Keats,* 937 F.2d 58, 66 (2d Cir. 1991), *cert. denied,* 502 U.S. 950, 112 S.Ct. 399, 116 L.Ed.2d 348 (1991) (emphasis added). This would suggest that § 4A1.3 properly encompasses more factors than the court of appeals has otherwise acknowledged.

In fact, the language of the Guidelines does not support a clear demarcation between relevant conduct and criminal history. Under § 4A1.3, criminal history scores can be increased for, inter alia, "prior similar adult criminal conduct not resulting in a criminal conviction." U.S.S.G. § 4A1.3(e). This definition encompasses virtually all acts that would be deemed "relevant conduct" under the Guidelines.

In the Eastern District of New York, the "relevant conduct" provision is most commonly employed when a defendant convicted of selling drugs is found to have made a number of similar sales, or a smuggler a number of similar trips. *See, e.g., United States v. Shonubi, supra.* The court of appeals requires the sentencing court to consider this "relevant conduct" under Guidelines § 1B1.4 and to estimate the total quantity of drugs involved in the prior transactions. *See, e.g., United States v. Schaper,* 903 F.2d 891, 898 (2d Cir.1990) (reversing trial judge's

decision to base sentence solely on quantity seized). No temporal limits have been imposed. *See, e.g., United States v. Santiago,* 906 F.2d 867, 872 (2d Cir.1990) (relevant conduct extended over 14 months); *but see United States v. Darmand,* 3 F.3d 1578, 1582 (2d Cir.1993) (suggesting in dicta that drug sales three years apart might not be "same course of conduct"). This type of conduct would seem to be criminal history in its most basic form, yet it has been labeled "relevant conduct" and consigned to the vertical axis.

### E. Inconsistency with *Witte*

In *Witte,* the defendant pled guilty to a single count of attempted possession of marijuana. At sentencing, the court increased his offense level based on the quantity of marijuana and cocaine imported by a members of a conspiracy of which Witte had been a part. Shortly thereafter, Witte was indicted for the cocaine offenses. The Court held that this prosecution for criminal conduct that had already been considered in his sentencing did not violate the double jeopardy clause of the Fifth Amendment.

In so holding, the Court noted that uncharged criminal conduct, as used at sentencing, informs the court's understanding of both the character of the offense and the character of the offender. Thus it rejected a rigid demarcation of the type adopted by the Second Circuit.

> Nothing about the labels given to these categories controls the use to which such information is put at sentencing. Under the Guidelines, . . . as under . . . traditional sentencing regimes, . . . 'it is difficult if not impossible to determine whether a given offense has affected the judge's assessment of the character of the offender, or the character of the offense, or both.'

*Witte* —— U.S. at ——, 115 S.Ct. at 2208 (citing *Witte* at ——, 115 S.Ct. at 2211 (Stevens, J., dissenting)). The Court found that relevant conduct and criminal history cannot be completely separated, stating:

> The relevant conduct provisions of the sentencing guidelines, like their criminal history counterparts . . ., are sentencing enhancement regimes evincing the judgment that a particular offense should receive a

more serious sentence . . . if it was either accompanied by or preceded by additional criminal activity.

*Id.* at ——, 115 S.Ct. at 2208.

Dissenting in *Witte,* Justice Stevens argued that in drug sentencing under the Guidelines, where quantity chiefly determines sentence, considering related offenses in determining offense level is tantamount to imposing additional convictions. *Id.* at —— ——, 115 S.Ct. at 2211–12 (Stevens, J., dissenting). The majority explicitly rejected this view. It held:

> To the extent that the Guidelines aggravate punishment for related conduct outside the elements of the crime on the theory that such conduct bears on the "character of the offense," the offender is still punished only for the fact that the present offense was carried out in a manner that warrants increased punishment, not for a different offense (which that related conduct may or may not constitute). But, while relevant conduct may thus relate to the severity of the particular crime, the commission of multiple offenses in the same course of conduct also necessarily provides important evidence that the character of the offender requires special punishment.

*Witte* at —— —— ——, 115 S.Ct. at 2207–08.

Thus, the Court suggested, conduct outside the offense of conviction is relevant to both criminal history and offense level computations. Understood as a recognition of the proper role of the sentencing judge, *Witte,* more generally, may signal a distancing from the Second Circuit court of appeals' practice of forcing judges to base decisions on hermetically sealed packets of information, belying the complexity and interrelatedness of crimes, criminals, and societal concerns. *Cf. Guidelines Manual* at 5 (Nov. 1, 1994) (Commission found "no practical way to combine and account for the large number of diverse harms arising in different circumstances. . . . The effort proposed as a solution to these problems required the use of, for example, quadratic roots and other mathematical operations that the Commission considered too complex to be workable.").

Sentencing judges must be able to draw on all available relevant information at sentencing. Protection of both the public and the defendant requires flexibility in obtaining relevant information in a manner that neither slights due process nor prevents the exercise of reasoned judgment by the judge who observes the defendant and must be primarily responsible for determining his or her sentence.

The suggestion that sentencing judges proceed step-by-step when departing is not without merit. To the extent it encourages thought before action, it helps ensure that judges do not over-sentence. The problem arises when the suggestion is turned into a mechanistic rule and a basis for vacating sentences properly determined.

## F. Remaining distinctions between horizontal and vertical departures after *Witte*

In *Witte*, the Supreme Court noted that no "bright line distinction" exists between relevant conduct and criminal history factors. *Id.* at ——, 115 S.Ct. at 2207. The relevant difference, it found, "is more temporal than qualitative, with the former referring simply to a defendant's past criminal conduct (as evidenced by convictions and prison terms), *see* U.S.S.G. § 4A1.1, and the latter covering activity arising out of the same course of criminal conduct as the instant offense." *Id.* at ——, 115 S.Ct. at 2207.

A distinction based on chronology is itself not wholly satisfactory. It is unclear how a "temporal" distinction—relegating prior acts to criminal history, and concurrent or nearly concurrent acts to relevant conduct—would work. For example, a number of courts have held that criminal "history" can include acts committed after the offense of conviction; this is the rule in the Second Circuit. *See, e.g., United States v. Espinal,* 981 F.2d 664 (2d Cir.1992); *United States v. Keats,* 937 F.2d 58, 66–67 (2d Cir.1991), *cert. denied,* 502 U.S. 950, 112 S.Ct. 399, 116 L.Ed.2d 348 (1991). For reasons outlined in *United States v. DeRiggi,* 893 F.Supp. 171 (E.D.N.Y. 1995), a judge may properly consider all facts available up until the time of sentence or resentence.

The Supreme Court's distinction can be understood as an attempt to elucidate the meanings generally assigned to the two phrases, but not as an attempt to artificially restrict decision-making. The opinion explicitly rejects a "bright line distinction." *Witte* —— U.S. at ——, 115 S.Ct. at 2207. Thus no attempt at redrawing the line is required.

## G. Applying present court of appeals' rules, what can be considered under § 4A1.3?

If reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes, the court may consider imposing a sentence departing from the otherwise applicable guideline range. Such information *may include, but is not limited to,* information concerning ... *prior similar adult criminal conduct not resulting in a criminal conviction.*

U.S.S.G. § 4A1.3 (emphasis added).

■ Under the non-exclusive language of § 4A1.3, uncharged conduct only marginally related to the offense of conviction can justify a criminal history departure. This point was clearly stated in *United States v. Cervantes,* 878 F.2d 50, 55 (2d Cir.1989), which held that bail jumping could be considered criminal history in a cocaine importation case. Noting that § 4A1.3 refers to "prior similar adult criminal conduct" as an example only, the court held:

Of course, bond forfeiture bears no resemblance to importing cocaine, the crime charged here. While the reference to like conduct raises the question whether the Commission chose to preclude departures because of prior non-similar acts, we are of the view that § 4A1.3 bars this interpretation. The 5 enumerated factors in the policy statement are not all inclusive. Indeed, the Guidelines state that a judge's consideration "may include, but is not limited to" the 5 elements.

*Id.* (citing U.S.S.G. § 4A1.3). The relevant language of § 4A1.3 has not been amended since *Cervantes* was decided.

More recent cases have explored the extent of judicial discretion under § 4A1.3. In *United States v. Mayo*, 14 F.3d 128 (2d Cir. 1994), the defendant was convicted of mail fraud, wire fraud, and bank fraud. The sentencing judge held that two arsons—apparently intended to create the appearance that records had been destroyed—could be considered criminal history under § 4A1.3. The court of appeals affirmed, holding that although the arson would not qualify as "relevant conduct" under § 1B1.3, it was sufficiently similar to qualify under § 4A1.3. Acknowledging that "the commentary recognizes that 'the criminal history score is unlikely to take into account all the variations in the seriousness of criminal history that may occur,' " *id.* at 131 (citing U.S.S.G. § 4A1.3, Background), the court chose to define "similar" broadly.

In *United States v. Chunza–Plazas,* 45 F.3d 51 (2d Cir.1995), heavily relied on by the defense, the defendant pled guilty to two counts of possessing fraudulent alien-identification cards. The district court sought to depart upward on the basis of Chunza's activities as a paid assassin for the Medellin cocaine cartel, which included homicides, drug trafficking, and assaults in Colombia. The defendant had fled Colombia prior to prosecution for those alleged crimes.

The court of appeals held this to be an impermissible departure. The only available basis for such a departure, it held, is § 4A1.3(e), pertaining to "prior *similar* adult criminal conduct." *Id.* at 56 (emphasis supplied). Therefore, according to the court, the departure was impermissible because "Chunza's alleged acts of terrorism, homicide, and drug dealing in Colombia were not similar to his possessing false U.S. immigration and social security documents in Staten Island." *Id.* at 57.

It is worth noting that in an unreported decision, *United States v. Munoz–Mosquera,* 978 F.2d 706 (2d Cir.1992) (Table), the court of appeals permitted just such a departure. Munoz, a Medellin cartel assassin who had done his evil work in Colombia, was convicted of using false documents and lying to government agents in New York. Under the Guidelines, the sentencing range for his joint offenses was 0 to 6 months. *United States v. Munoz–Mosquera,* No. 91–CR–1075 (E.D.N.Y.), Presentence Report, Dec. 26, 1991, at 5. He was, instead, sentenced to six years in prison, the cumulative maximum term permitted under the applicable statutes. Munoz was somewhat more notorious in his overseas crimes than *Chunza,* but this is not a principled distinction. In *Munoz,* the court of appeals recognized sotto voce that the trial judge must not ignore danger to the community, however determined.

*Chunza–Plazas* is, in any event, easily distinguishable from *Mayo.* The court repeatedly mentioned the fact that Chunza's uncharged offenses were committed overseas, and that the Guidelines contain "precise provisions as to how charges and foreign sentences may be used." 45 F.3d at 56. The court stated: "[I]t is significant that nowhere do the guidelines specifically authorize the use of unrelated, uncharged foreign criminal conduct, or even foreign arrests, for a departure in the criminal history category." *Id.* at 56. The court went on, in considering an offense level departure, to note that "Congress ... has chosen to assign to foreign crimes a rather limited role" and that "there are good reasons to avoid creating a new use for foreign crimes in sentencing." *Id.* at 57 (quoting *United States v. Azeem,* 946 F.2d 13, 16 (2d Cir.1991)).

Nowhere in the opinion does the court acknowledge that the list of criminal conduct in § 4A1.3 is non-exclusive. The "good reasons to avoid creating a new use for foreign crimes in sentencing" are, arguably, the reasons for this omission.

## H. Applying present court of appeals' rules, what can be considered under § 5K2.0?

■ Under U.S.S.G. § 5K2.0, a district court may depart upward if it finds "that there exists an aggravating ... circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." One legitimate basis for upward departure under § 5K2.0 is an act of misconduct by the defendant that was " 'relate[d] in some way to the offense of conviction, even though not

technically covered by the definition of relevant conduct.'" *United States v. Uccio*, 917 F.2d 80, 86 (2d Cir.1990) (quoting *United States v. Kim*, 896 F.2d 678, 684 (2d Cir. 1990)). Some relationship between the uncharged conduct and the offense of conviction is all that is required. In *Kim*, the court, after an extensive discussion of the history and policy considerations underlying § 5K2.0, stated:

> We conclude that, with respect to acts of misconduct not resulting in conviction, the Commission intended to preclude departures for acts bearing no relationship to the offense of conviction, but to permit departures for acts that relate in some way to the offense of conviction.

896 F.2d at 684. *See also United States v. Wright*, 873 F.2d 437, 441 (1st Cir.1989) (Breyer, J.) (defining "relevant conduct" as "conduct relevant to the offense in question, *or* past behavior relevant to determining an appropriate penalty for the crime") (emphasis added). An appropriate penalty is, obviously, the purpose of any departure, whether vertical or horizontal.

■ The statutory direction is clear. The sentencing court must consider the various aims of sentencing—general and specific deterrence, incapacitation, retribution, and rehabilitation—in connection with the Guidelines. See 18 U.S.C. § 3551; *United States v. Concepcion*, 795 F.Supp. 1262 (E.D.N.Y. 1992), *disapproved on other grounds, United States v. DeRiggi*, 45 F.3d 713 (2d Cir.1995) (sentencing judges should contemplate statutes but follow Guidelines). Where the Guidelines do not precisely cover the specific problem or complex of problems presented by the case, a reasonable departure, to protect the public as well as the defendant and his or her family, is required. This extremely complicated and important enterprise entails in-depth application of all the understanding, empathy, and judgment the trial court can bring to bear. The process is three-dimensional and alive. Converting it through oversimplification and mechanization into a two-dimensional, cartoon-like exercise does a disservice to justice—the holy grail of the law.

## I. Applying present court of appeals' rules, what can't the court consider?

■ Under traditional sentencing practice, the court considered all criminal conduct by the defendant—charged or uncharged, related or unrelated, prior or concurrent or even subsequent to the offense of conviction—by the defendant. The Guidelines have not altered this practice. The decision to permit departures both for "criminal history" and "related conduct," two categories which, as described above, are both broadly defined and overlapping, marks the intention to continue this practice.

Judges do not have unlimited power to set sentences grossly out of proportion to the offense of conviction—such that a defendant brought in for a parking violation can be sentenced for an uncharged murder. Every federal criminal statute includes a maximum sentence, which limits the judge's discretion at sentencing. In the instant case, the maximum term of 60 months serves as an upper limit on the judge's discretion.

## J. Conclusion on law

The defense position—that uncharged, unrelated conduct cannot be considered either horizontally or vertically—is inconsistent with any rational view of the sentencing process and the goals enumerated in 18 U.S.C. § 3553. These include the need for incapacitation, which is necessarily based on the trial judge's view, as informed by the evidence at sentence, of the dangerousness of the defendant.

■ The court of appeals' demarcation between vertical and horizontal concerns is inconsistent with the Guidelines; with the purposes and theory of sentencing; and with the Supreme Court's view. Requiring courts to distinguish between § 5K2.0 and § 4A1.3 departures, and then to follow procedures inexplicably associated with one but not the other, undermines sentencing judges' ability to focus on the human problems before them at every sentencing proceeding. *See United States v. Naugle*, 879 F.Supp. 262 (E.D.N.Y. 1995). Where judges must deal with the infinite variety of crimes and criminals, and of a society that requires protection, caselaw

should assist in, not detract from, this holistic process.

## IV. APPLICATION OF LAW TO FACTS

■ Normally, a VIN case is a relatively benign property case involving interference with state control of auto registration. Here it was a central factor in an extremely hazardous conglomeration of related crimes. The court, under the circumstances and the law of the Second Circuit, is authorized to depart both horizontally and vertically in exercising its discretion and in discharging its duty to effectuate the purposes of sentencing, including incapacitation. At resentencing, it again considered this duty in light of new information while following the court of appeals' mandate.

### A. Relevant conduct

■ As indicated in more detail at the sentencing proceeding, *see* Transcript, June 28, 1995, Tropiano was actively engaged in selling cocaine as well as defrauding insurance companies, aiding in the stealing of automobiles, forging documents, and compelling people to cooperate in his multifaceted criminal endeavors by manipulating them because of their use of drugs and need to pay him. He had no compunction about involving wholly blameless people such as the owners of the garage where he stored one of the autos he used and from which he ran his criminal enterprises. There is proof by clear and convincing evidence that Tropiano possessed the gun found in the trunk for use in his cocaine and VIN activities. *Cf. United States v. Melendez,* 60 F.3d 41, 46–47 (2d Cir.1995), (reviewing bases on which triers properly inferred that guns were used in connection with drug crimes). Tropiano's cocaine distribution scheme was long-standing and continued even while he was out on bail, when he tried to collect for a prior cocaine sale.

The court finds by clear and convincing evidence that a total of more than one kilogram of cocaine was dispensed by the defendant as a part of his integrated criminal schemes. The court of appeals has consistently approved methods of estimating drug quantities from data less reliable and complete than the records considered in this case. *See, e.g., United States v. Mickens,* 926 F.2d 1323, 1331–32 (2d Cir.1991), *cert. denied,* 502 U.S. 1060, 112 S.Ct. 940, 117 L.Ed.2d 111 (1992) (approving drug quantity estimate based on amount of money that changed hands); *United States v. Jacobs,* 955 F.2d 7, 9 (2d Cir.1992) (same); *United States v. Prescott,* 920 F.2d 139, 142 (2d Cir.1990) (relying largely on number of phone calls made and received in estimating quantity of drugs).

The VIN number crime was a central feature of Tropiano's criminal activities. The evidence, as already indicated, established that Tropiano used his drug customers to further his stolen car retagging business. For example, Tropiano's longstanding cocaine customer Philip Stines testified that he had agreed to participate in an insurance scheme involving the stolen Eldorado in order to pay his drug debt to Tropiano. Tropiano's share of these proceeds was in payment for cocaine that Stines had purchased from Tropiano on credit. Similarly, Tropiano used another of his cocaine customers, Salvatore Marchese, to register a stolen van in return for a $300 reduction of his cocaine debt. Tropiano used his stolen car retagging business to further his drug business and his drug business to further his VIN business. Tropiano was, in short, a one-person crime wave using the VIN scheme as a central element of his multifarious and nefarious activities.

These offenses are "relevant conduct," for purposes of § 5K2.0, in that they explain and reveal the full extent of the defendant's offense of conviction. The character of that offense can be understood only in light of these additional criminal acts. They more than satisfy the standard, announced in *Uccio* and *Kim,* that they be "related" to the offense of conviction.

■ The defendant has argued that the court should not consider the gun both because the defendant was acquitted of the gun charge and because the court said it would not consider the gun at the first sentence. Defense Letter, June 27, 1995, at 1. Under the law of this circuit, acquitted conduct may be considered at sentencing. *See, e.g., Unit-*

ed States v. Rodriguez–Gonzalez, 899 F.2d 177, 181–82 (2d Cir.), cert. denied, 498 U.S. 844, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990). The highly-principled reservations expressed in Judge Newman's concurrence in United States v. Concepcion, 983 F.2d 369, 393–95 (2d Cir.1992) (Newman, J., concurring), have not led the court of appeals to change its position. Additionally, in deciding to consider the gun, the court is not bound by its determination at the first sentence. A resentence following vacation is a sentence de novo. See United States v. Ekwunoh, 888 F.Supp. 369, 371 (E.D.N.Y.1994), and cases cited therein.

 At resentencing, the court initially determined that the defendant's relevant conduct warranted a seven point upward adjustment, bringing his offense level to 23. In determining the extent of this adjustment, the court noted that, under the Drug Quantity Table, transactions involving one kilogram of cocaine warrant a base offense level of 26. U.S.S.G. § 2D1.1(c)(9). Moreover, the use of a gun would require an adjustment of 2 levels, see U.S.S.G. § 2D1.1(b)(1), bringing the total offense level to 28. Under the law of this circuit, it is only necessary that the firearm be "present." United States v. Schaper, 903 F.2d 891, 895 (2d Cir.1990).

 At sentencing, the defendant's sister-in-law spoke eloquently about both the defendant's character as well as her intention to serve as a guiding force in the defendant's life after his release. She runs a large business and is in a position to employ him. This last point is relevant to the magnitude of the upward departure, since the court has considered relevant conduct principally in relation to the need for incapacitation. Incapacitation is meant to protect society from the defendant, and the defendant from himself. These same goals can be served, to a lesser or greater degree, by community or family control in those cases where it is available. Thus, the court's belief that the defendant's family will be able to exert some control over him after his release from prison serves as a basis for tempering the relevant conduct departure. For this reason, the court departs upward only to an offense level of 19, permitting it to sentence defendant to less than the

five years justifiable under the guidelines. Even in light of the availability of family supervision, a lesser departure would not be sufficient.

The court has considered each intermediate step and an upward departure of at least three steps is the minimum required under the Guidelines. A lesser departure would not suffice under § 5K2.0.

### B. Criminal history

 A horizontal shift under § 4A1.3 is also required. The evidence proffered on remand indicates a long history of fraudulent document offenses, many involving automobile and driving records. These offenses are similar to the offense of conviction, and thus constitute grounds for a horizontal departure under even the narrowest reading of § 4A1.3. Given the large number of such offenses, including several that would constitute felonies, the court finds that a departure to Level IV is the minimum that suffices under § 4A1.3.

 The vertical seven-point shift and horizontal two-level adjustment are not duplicative. Each depends upon different evidence and is made independently of the other. There has been no double-counting.

### V. CONCLUSION

The court places Tropiano in Criminal History category IV and at offense level 19. The applicable sentencing range is 46–57 months. This is below the statutory maximum for Tropiano's offense. He is sentenced to 51 months in prison. Also imposed are a $10,000 fine, three years' supervised release, and a $50 assessment. During the period of supervised release, the defendant must either work full-time or attend school full-time; probation may permit a combination of work and school. This requirement, in combination with the supervision of his family, should weaken any impulse toward recidivism.

The $10,000 fine is consistent with Guidelines § 5E1.2. It was reduced from the $50,-000 imposed at the first sentence. A defendant unburdened by excessive debt is less likely to return to a life of crime. The fine is payable at any time during the period of

supervised release. No interest shall accrue as long as the fine is paid within that time.

The defendant is bright and has strong family support. Should he decide to give up his life of crime and work at a legitimate job, he should be able to lead a decent life.

SO ORDERED.